**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**No. 16-5129**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**BANNER HEALTH f/b/o BANNER GOOD SAMARITAN MEDICAL CENTER**, *et al.*,
*Plaintiffs-Appellants,*

v.

**SYLVIA M. BURWELL, Secretary, Department of Health and Human Services,**
*Defendant-Appellee.*

---

*On Appeal from the United States District Court*
*for the District of Columbia*
*Civil Action No. 1: 10-CV-01638-CKK*

---

**BRIEF FOR THE APPELLANTS**

---

STEPHEN P. NASH
SVEN C. COLLINS
SQUIRE PATTON BOGGS (US) LLP
1801 California Street, Suite 4900
Denver, Colorado 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
Email: stephen.nash@squirepb.com
Email: sven.collins@squirepb.com
***Attorneys for Appellants***

---

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellants, by and through their undersigned counsel, hereby certify the following as to Parties, Rulings and Related Cases:

**A.    Parties**

**1.    Appellants**

Appellants, plaintiffs below, are hospitals that participated in the Medicare program during all times relevant to this action.  Attachment A shows all parent companies and any publicly held company that has a 10 percent or greater ownership interest in Appellants.

**2.    Appellee**

Appellee, defendant below, is the Secretary of the United States Department of Health and Human Services.

**3.    Intervenors and Amici Curiae**

There are no intervenors or amici curiae in this action and there also were none in the District Court.

**B.    Rulings Under Review**

Appellants seek review of the following rulings issued by the United States District of Columbia (Colleen Kollar-Kotelly):

| Document Name | Date | ECF No. | Official Citation |
|---|---|---|---|
| Order | 5/16/2013 | 82 | N/A |
| Memorandum Opinion | 5/16/2013 | 83 | 945 F. Supp. 2d 1 (D.D.C. 2013) |
| Memorandum Order | 7/30/2013 | 96 | 2013 U.S. Dist. LEXIS 147713 (D.D.C. July 30, 2013) |
| Order | 7/7/2014 | 116 | 55 F. Supp. 3d 1 (D.D.C. 2014) |
| Memorandum Opinion | 7/7/2014 | 117 | 55 F. Supp. 3d 1 (D.D.C. 2014) |
| Scheduling and Procedures Order | 7/17/2014 | 122 | N/A |
| Order | 9/2/2015 | 149 | 126 F. Supp. 3d 28 (D.D.C. 2015) |
| Memorandum Opinion | 9/2/2015 | 150 | 126 F. Supp. 3d 28 (D.D.C. 2015) |
| Minute Order | 10/14/2015 | N/A | N/A |
| Order | 3/31/16 | 163 | 2016 U.S. Dist. LEXIS 42787 (D.D.C. Mar. 31, 2016) |

| Document Name | Date | ECF No. | Official Citation |
|---|---|---|---|
| Memorandum Opinion | 3/31/16 | 164 | 2016 U.S. Dist. LEXIS 42787 (D.D.C. Mar. 31, 2016) |

## C.    <u>Related Cases</u>

This case was not previously before this Court or any other court. Appellants are unaware of "any other related case," as defined by Circuit Rule 28(a)(1)(C). However, *Lee Memorial Hospital, et al v. Burwell*, Case No. 13-cv-00643-RMC (D.D.C.), *University of Colorado Health At Memorial Health, et al v. Burwell*, Case No. 14-cv-01220-RC (D.D.C.), and *Charleston Area Medical Center et al v. Burwell*, Case No. 15-cv-02031-JEB (D.D.C.), include, among other issues, issues similar to issues presented by this action, with the same defendant and some overlapping plaintiffs.

# ATTACHMENT A

| Hospital - Appellant | Parent(s) | Publicly held company that has a 10% or greater ownership interest in the entity |
|---|---|---|
| BANNER HEALTH, f/b/o Banner Good Samaritan Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o North Colorado Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o McKee Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Thunderbird Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Mesa Medical Center | Banner Health | None |
| BANNER HEALTH , f/b/o Banner Desert Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Estrella Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Baywood Medical Center | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Heart Hospital | Banner Health | None |
| BANNER HEALTH, f/b/o Banner Boswell Medical Center | Banner Health | None |

| Hospital - Appellant | Parent(s) | Publicly held company that has a 10% or greater ownership interest in the entity |
|---|---|---|
| ABBOTT NORTHWESTERN HOSPITAL | Allina Health | None |
| BUFFALO HOSPITAL | Allina Health | None |
| CAMBRIDGE MEDICAL CENTER | Allina Health | None |
| MERCY HOSPITAL | Allina Health | None |
| NEW ULM MEDICAL CENTER | Allina Health | None |
| OWATONNA HOSPITAL | Allina Health | None |
| ST. FRANCIS REGIONAL MEDICAL CENTER | Allina Health | None |
| UNITED HOSPITAL | Allina Health | None |
| UNITY HOSPITAL | Allina Health | None |
| BILLINGS CLINIC | None | None |
| CABELL-HUNTINGTON HOSPITAL | None | None |
| CHARLESTON AREA MEDICAL CENTER | None | None |
| DENVER HEALTH AND HOSPITAL AUTHORITY | None | None |
| GOOD SAMARITAN HOSPITAL | None | None |
| HALIFAX COMMUNITY HEALTH SYSTEM, a/k/a Halifax Medical Center | None | None |
| MEMORIAL HEALTH SYSTEM COLORADO SPRINGS, a/k/a Memorial Health System | UCHealth | None |

| Hospital - Appellant | Parent(s) | Publicly held company that has a 10% or greater ownership interest in the entity |
|---|---|---|
| Foundation | | |
| PARKVIEW MEDICAL CENTER | None | None |
| VALLEY VIEW HOSPITAL | None | None |
| WEST VIRGINIA UNIVERSITY HOSPITAL | None | None |

010-8258-9442

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................1

II.    STATEMENT OF JURISDICTION .....................................1

III.   ISSUES PRESENTED FOR REVIEW ...................................1

IV.    STATUTES AND REGULATIONS INVOLVED ...............2

V.     STATEMENT OF THE CASE ...............................................2

    A.   Factual Background.....................................................2

        1.   Congress enacted the outlier statute to compensate
            hospitals for treating extraordinarily sick Medicare
            patients ...................................................................2

        2.   HHS implemented the outlier statute through
            interdependent payment regulations and annual
            threshold regulations ............................................4

            a.   Before 2003, HHS's payment regulations used
                data with little predictive value to determine
                hospital cost-to-charge ratios ("CCRs") used to
                adjust charges to costs, thus inviting hyper-inflated
                claims, or "turbo-charging" ...............................5

            b.   For FYs 1997-2003, HHS repeatedly hyper-
                inflated the threshold, in total by 246%, in a
                misguided countermeasure to unprecedented
                overpayments, without examining the root cause
                (turbo-charging) or considering the negative
                impact on the rest of the hospitals ...................8

        3.   When FY 2003 started, a Wall Street analyst exposed
            turbo-charging....................................................12

        4.   In February 2003, HHS approved and sent for OMB
            review an Interim Final Rule ("IFR") to end turbo-
            charging and to immediately reduce the turbo-charged
            threshold........................................................13

010-8258-9442

5.      During OMB review, HHS repackaged the IFR as a proposed rule, but deleted mention of HHS's efforts to neutralize the turbo-charged data and HHS's conclusion that it must immediately lower the threshold.................................................................15

6.      CMS Administrator Scully testified that OMB had overruled HHS's decision to lower the turbo-charged threshold...............................................................16

7.      In June 2003, HHS issued an outlier correction rule to halt turbo-charging, but failed to address the alternatives HHS had considered critical to resetting the program to Congress's intent, including immediately lowering the hyper-inflated threshold.............18

8.      Although touting that turbo-charging was now history, HHS still used historically turbo-charged data to set a FY 2004 threshold at close to the turbo-charged peak, thus generating total outlier payments of less than 70% of HHS's target .................................................20

9.      In FY 2005, HHS set another inflated threshold – again using data distorted by historical turbo-charging, CCRs known to be excessive, and without accounting for reconciliation – which paid out only 77% of the 5.1% target ........................................................22

10.     HHS's FY 2006 threshold again used excessive CCRs and failed to account for reconciliation and again paid out well below the 5.1% target ...........................................23

11.     For its FY 2007 threshold, HHS finally acknowledged needing to adjust the projection CCRs, but applied a miniscule adjustment compared to the actual record trend of decline, and still failed to account for reconciliation's impact.......................................24

12.     HHS's FYs 2004-2007 rulemakings repeatedly asserted the impact of reconciliation was negligible, but failed to disclose that outlier claims totaling $664M had been referred for reconciliation ........................25

B.      Procedural Background ....................................................26

1.  The Hospitals' motion to compel revealed that HHS failed to preserve key records relating to the pivotal 2003 correction rule and FY 2004 rulemakings .................26

2.  The district court denied the Hospitals' motion to amend the complaint to add a procedural challenge............27

3.  *District Hospital Partners'* Remand Of The FY 2004 Threshold And HHS's Remand Explanation......................27

**VI.   SUMMARY OF THE ARGUMENT ........................................28**

**VII.  STANDARD OF REVIEW ................................................32**

**VIII. ARGUMENT .................................................................32**

A.  After Concluding That The FY 2003 Threshold Had Been Turbo-Charged Almost 60%, HHS's Midyear Decision To Leave It At That Peak Violated The APA .........................32

1.  HHS's decision not to lower the threshold violated the statute ..................................................................33

2.  HHS's decision not to lower the threshold was also arbitrary and capricious ......................................38

B.  HHS Set The FYs 2004-2007 Thresholds Without Adjusting For Data It Knew Was Distorted By Historical Turbo-Charging And By Other Factors, Thus Yielding Thresholds That Were Likely To And Did Pay *Below* HHS's 5.1% Target And The Statutory Minimum .........................................................44

1.  HHS knew the CCRs it used to project outlier payments were materially higher than the CCRs that would later be used during the upcoming FY to pay claims, thus invalidly "baking in" underpayments.............45

2.  HHS's FY 2004 threshold was unreasonably infected by turbo-charged data, as HHS's remand explanation confirms ........................................................51

    a.  The district court improperly narrowed this Court's remand order ...............................................52

- iii -

b.    HHS's remand explanation articulates no rational basis for grossly distorting its calculation of average charge inflation with turbo-chargers' data and for using CCRs calibrated to FY 2000 despite assuming over 60% subsequent charge growth............53

3.    HHS's FY 2005 rulemaking again arbitrarily and capriciously failed to correct for problems presented in FY 2004 and set another excessive threshold.....................64

4.    HHS's FY 2006 rulemaking was the third consecutive year that HHS unreasonably failed to account for steady declines in the CCRs or for reconciliation ..............70

5.    In FY 2007, HHS once again arbitrarily and capriciously used overstated CCRs and ignored reconciliation's impact, thus generating another predictably excessive threshold ...........................................73

C.    Even Before Discovering Turbo-Charging, HHS Should Have Known Its Regulations Relied On A Faulty Factual Predicate And, Thus, Violated The APA ..........................................77

1.    HHS knew that its 1988 payment regulation permitted charge manipulation, but nevertheless assumed that hospital charges would increase proportionally to costs .....79

2.    Despite mounting evidence of its model's failure, HHS kept blindly trying to out-inflate what was turbo-charging without ever examining the root causes of the problem ...................................................................81

a.    Long before FY 2001, HHS knew it could no longer assume that charges increased proportionally to costs ..................................82

b.    Contemporaneous data during each of the FYs 2001-2003 rulemakings demonstrated that HHS's model failed to set thresholds likely to pay at HHS's 5.1% target .........................................83

D.    From FYs 1997-2003, HHS Violated Its Own Regulation And Used Statewide Average CCRs That Were Both Outdated And Inaccurately Calculated ....................................................88

- iv -

E.    The District Court Abused Its Discretion In Refusing To Consider Materials Cited And/Or Submitted In Appellants' Summary Judgment Motion .................................................. 90

    1.    Tables ................................................................. 91

    2.    Additional Items .................................................. 93

    3.    Comment Letter .................................................. 95

F.    The Hospitals' Claims Under APA Section 553 Are Not Futile ....... 96

**IX.    CONCLUSION ........................................................................... 99**

010-8258-9442

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005)..................................................41, 68

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)........................................................98

*Alpharma, Inc. v. Leavitt*,
  460 F.3d 1 (D.C. Cir. 2006)........................................................52, 58

*\*Am. Petroleum Inst. v. EPA*,
  706 F.3d 474 (D.C. Cir. 2013)....................................................78, 88

*\*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008).............................................68, 96, 98

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008)........................................................32

*Appalachian Power Co. v. EPA*,
  249 F.3d 1032 (D.C. Cir. 2001)...................................................75, 78

*Banner Health v. Burwell*,
  2016 U.S. Dist. LEXIS 42787 (D.D.C. Mar. 31, 2016) (CKK)
  ....................................................................28, 55, 56, 58, 61

*Banner Health v. Burwell*,
  55 F. Supp. 3d 1 (D.D.C. July 7, 2014) (CKK)...........................27, 96

Authorities upon which we chiefly rely are marked with asterisks.

- vi -

*Banner Health v. Sebelius*,
  126 F. Supp. 3d 28 (D.D.C. Sept. 2, 2015) (CKK) ...............................................
  ................................................... 26, 28, 35, 36, 40, 42, 43, 52, 53, 58, 61, 72,
  ................................................... 76, 79, 81, 82, 83, 85, 86, 87, 89, 91, 92, 93, 95

*Banner Health v. Sebelius*,
  945 F. Supp. 2d 1 (D.D.C. May 16, 2013) (CKK) ............................................26

*Bechtel v. FCC*,
  957 F.2d 873 (D.C. Cir. 1992)...........................................................................81

*Belbacha v. Bush*,
  520 F.3d 452 (D.C. Cir. 2008)...........................................................................53

*Bellsouth Telcomms., Inc. v. FCC*,
  469 F.3d 1052 (D.C. Cir. 2006).........................................................................50

*Boca Raton Cmty. Hosp. v. Tenet Healthcare Corp.*,
  9:05-cv80183-PAS, ECF No. 47 (S.D. Fla. May 17, 2005)........................36, 94

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998).........................................................................98

*Chem. Mfrs. Ass'n v. EPA*,
  28 F.3d 1259 (D.C. Cir. 1994)...........................................................................72

*City of Arlington v. FCC*,
  133 S. Ct. 1863 (2013)......................................................................................37

*\*Cnty. of L.A. v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)...................... 2, 3, 33, 34, 37, 45, 51, 79, 85, 87

*Competitive Enter. Inst. & Consumer Alert v. NHTSA*,
  956 F.2d 321 (D.C. Cir. 1992)...........................................................................44

*Deppenbrook v. Pension Benefit Guar. Corp.*,
  778 F.3d 166 (D.C. Cir. 2015)...........................................................................32

*\*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015)
  .............................. 3, 5, 8, 9, 27, 39, 41, 44, 51, 53, 57, 64, 65, 66, 70, 77, 79, 95

- vii -

*Electricity Consumers Res. Council v. FERC*,
  747 F.2d 1511 (D.C. Cir. 1984) .................................................................43, 90

*Farmers Union Cent. Exch., Inc. v. FERC*,
  734 F.2d 1486 (D.C. Cir. 1984) .................................................................44

*Gas Appliance Mfrs. Ass'n v. DOE*,
  998 F.2d 1041 (D.C. Cir. 1993) .................................................................79

*Greyhound Corp. v. ICC*,
  668 F.2d 1354 (D.C. Cir. 1981) .................................................................52, 64

*Guindon v. Pritzker*,
  31 F. Supp. 3d 169 (D.D.C. 2014) .............................................................78, 88

*Hajjar-Nejad v. George Washington Univ.*,
  37 F. Supp. 3d 90 (D.D.C. 2014) ...............................................................92

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) ...................................................................42

*Levine v. Am. Psychological Ass'n*,
  766 F.3d 39 (D.C. Cir. 2014) .....................................................................32

*Martin v. D.C.*,
  78 F. Supp. 3d 279 (D.D.C. 2015) .............................................................92

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013) .................................................................76

*Nat'l Black Media Coal. v. FCC*,
  775 F.2d 342 (D.C. Cir. 1985) ...................................................................41, 77

*Nat'l Envtl. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ...................................................................90

*Nat'l Mining Ass'n v. Jackson*,
  856 F. Supp. 2d 150 (D.D.C. 2012) ...........................................................94

*Natural Res. Def. Council v. EPA*,
  755 F.3d 1010 (D.C. Cir. 2014) .........................................................63, 76, 81, 83

010-8258-9442

*Ne. Hosp. Corp. v. Sebelius*,
    657 F.3d 1 (D.C. Cir. 2011)................................................................37

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety
    Admin.*,
    494 F.3d 188 (D.C. Cir. 2007).....................................................68, 72

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011)............................................................85

*Pub. Citizen & Ctr. for Auto Safety v. Steed*,
    733 F.2d 93 (D.C. Cir. 1984)..............................................................41

*Select Specialty Hosp. – Bloomington, Inc. v. Burwell*,
    757 F.3d 308 (D.C. Cir. 2014)............................................................43

*Shays v. FEC*,
    528 F.3d 914 (D.C. Cir. 2008)....................................................37, 68

*Sierra Club & La. Envtl. Action Network v. EPA*,
    755 F.3d 968 (D.C. Cir. 2014)............................................................37

*Sorenson Commc'ns, Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)....................................................72, 75

*Taylor v. Mills*,
    892 F. Supp. 2d 124 (D.D.C. 2012)....................................................92

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobaco, Firearms, &
    Explosives*,
    437 F.3d 75 (D.C. Cir. 2006)..............................................................69

*\*Walter O. Boswell Mem'l Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984).............................................41, 57, 66

*Weaver v. Fed. Motor Carrier Safety Admin.*,
    744 F.3d 142 (D.C. Cir. 2014)............................................................63

*Yakima Valley Cablevision, Inc. v. FCC*,
    794 F.2d 737 (D.C. Cir. 1986)............................................................41

010-8258-9442

**Statutes**

42 U.S.C § 1395oo(d)(5)(A) ..............................................................33, 34

42 U.S.C. § 1395oo(f) ..........................................................................1

42 U.S.C. § 1395ww(d) ............................................1, 3, 4, 6, 36, 80

**Other Authorities**

42 C.F.R. §§ 412.80-86 ........................................................................4

42 C.F.R. § 412.84 ...........................................................3, 5, 7, 88

Fed. R. Evid. 1006 ...............................................................................93

*Medicare Outlier Payments to Hospitals: Hearing Before Subcomms. on Appropriations and Labor, Health & Human Services, and Education*, 108th Cong. 108-268 (2003)
    ............................................................ 12, 17, 18, 40, 87, 94

010-8258-9442

## <u>GLOSSARY OF ABBREVIATIONS AND ACRONYMS</u>

APA                Administrative Procedure Act

AR                 Administrative Record

CMS              Centers for Medicare & Medicaid Services

CCR              Cost-to-Charge Ratio

DRG              Diagnosis Related Groups

FY                 Federal Fiscal Year (October 1 – September 30)

MedPAR File     Medicare Provider Analysis and Review File

IFR               Interim Final Rule

OMB              Office of Management and Budget

Secretary          Secretary of the United States Department of Health & Human Services

010-8258-9442

# I.     INTRODUCTION

Appellants, 29 non-profit acute care hospitals (the "Hospitals"), were injured by and challenge the invalid interpretation and application by the appellee Secretary of Health and Human Services ("HHS") of the outlier payment provisions under the Medicare Act.  Through a series of invalid regulations governing outlier payments during federal fiscal years ("FY") 1998-2007, HHS harmed the very hospitals that Congress intended to protect.

# II.     STATEMENT OF JURISDICTION

The Hospitals brought this action in the district court pursuant to 42 U.S.C. § 1395oo(f)(1) for expedited judicial review of HHS's determinations of the amount of Medicare outlier payments for hospital fiscal years 1997 through 2007 under 42 U.S.C. § 1395ww(d).  The district court granted summary judgment in favor of HHS, disposing of all claims, in two memorandum opinions and orders filed on September 2, 2015 and March 31, 2016.  The Hospitals timely appealed on May 17, 2016.  This Court has jurisdiction under 28 U.S.C. § 1291.

# III.    ISSUES PRESENTED FOR REVIEW

1.     Whether HHS's decisions to set (and in 2003 not to correct) the thresholds for the FYs 1998-2007 here at issue were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. §706.

010-8258-9442

2.      Whether the district court erred by denying the Hospitals' request to amend the complaint to claim that HHS's 2003 outlier correction rule violated the notice and comment provisions of the APA, 5 U.S.C. § 553.

3.      Whether the district court erred in striking certain exhibits to the Hospitals' Motion for Summary Judgment and refusing to consider certain documents and extra record evidence.

## IV.    STATUTES AND REGULATIONS INVOLVED

Relevant statutes and regulations are set forth in the Addendum.

## V.    STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Congress enacted the outlier statute to compensate hospitals for treating extraordinarily sick Medicare patients

In establishing the Inpatient Prospective Payment System ("IPPS"), Congress anticipated Medicare providers would "inevitably care for some patients whose hospitalization would be extraordinarily costly or lengthy" and enacted the outlier program to "insulate hospitals from bearing a disproportionate share of these atypical costs." *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1009 (D.C. Cir. 1999).  The outlier program is intended to protect access to care by "alleviat[ing] any financial disincentive hospitals may" have to caring for extraordinarily sick patients.  JA__-AR 4404.

2

Congress mandated specific parameters, codified at 42 U.S.C. § 1395ww

(d)(3) & (5)(A), that establish and limit HHS's authority to pay outlier cases:

1.      HHS must make outlier payments "in any case where charges,

adjusted to cost, exceed … the sum of [the ordinary case payments] … plus a fixed

dollar amount determined by [HHS]."  42 U.S.C. § 1395ww(d)(5)(A)(ii).[1]  HHS

sets the "fixed dollar amount" (the threshold) in its annual IPPS rulemakings.

2.      Outlier payments "shall … approximate the marginal cost of care

beyond the cutoff point" (*i.e.*, the sum of the threshold plus the ordinary case

payments).  42 U.S.C. § 1395ww(d)(5)(A)(iii).[2]

3.      HHS must set thresholds "which, when tested against historical data,

will likely produce aggregate outlier payments totaling between five and six

percent of projected or estimated DRG related payments."  *Cnty. of L.A.*, 192 F.3d

at 1013 (emphasis added); 42 U.S.C.  § 1395ww(d)(5)(A)(iv).  For the years here

at issue, HHS set thresholds targeting total outlier payments at 5.1% of total

projected DRG payments.  JA__-AR 7403.

---

[1] Ordinary case payments include the payment rate for the applicable diagnosis-related groups ("DRG") and other supplemental payments not here at issue.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 50 n.1 (D.C. Cir. 2015).

[2] HHS interprets "marginal cost of care" as 80% of the cost of care above the sum of the threshold and the ordinary case payments.  *See* 42 C.F.R. § 412.84(k); JA__-AR 4408.  That interpretation is not at issue.

3

Medicare participating hospitals self-fund the outlier program through a reduction in their base DRG payment rates "by a factor equal to the proportion of [total DRG] payments" that HHS projects will be made for outlier payments (the statutory offset). 42 U.S.C. § 1395ww(d)(3)(B). Thus, for the years at issue, HHS reduced each hospital's DRG-based payments for each ordinary case by 5.1% to fund payments for outlier cases.

    2.    <u>HHS implemented the outlier statute through interdependent payment regulations and annual threshold regulations</u>

Two sets of regulations govern the qualification for outlier payments: (1) payment regulations determining which individual patient cases qualify for outlier payments, 42 C.F.R. §§ 412.80-86;[3] and (2) threshold regulations determining HHS's annual threshold, used to define extraordinarily costly, "outlier" cases.[4] Each threshold regulation sets the threshold based on the payment regulations and other factors.

---

[3] The payment regulations were promulgated in 1988 and amended in 1994 and 2003. *See* JA__-AR 7369; JA__-6648; JA__-4396.

[4] The threshold regulations at issue here are those governing FYs 1997-2007: FY 1997 (JA__-AR 5599 (the first page of the Regulation)); FY 1998 (JA__-AR 5518.1); FY 1999 (JA__-AR 5403); FY 2000 (JA__-AR 5356); FY 2001 (JA__-AR 5233); FY 2002 (JA__-AR 4934); FY 2003 (JA__-AR 4778); FY 2004 (JA__-AR 1139); FY 2005 (JA__-AR 1003); FY 2006 (JA__-AR 640); FY 2007 (JA__-AR 8166).

4

a.    <u>Before 2003, HHS's payment regulations used data with little predictive value to determine hospital cost-to-charge ratios ("CCRs") used to adjust charges to costs, thus inviting hyper-inflated claims, or "turbo-charging"</u>

To determine whether inpatient cases qualify for outlier payments, the statute mandates that a hospital's charges be adjusted to its costs. HHS performs this adjustment by multiplying the hospital's billed charges by its "cost-to-charge ratio" ("CCR"). The CCR is the ratio of (1) the hospital's total Medicare-allowed costs in a fiscal year (as determined from an annual cost report) to its (2) total Medicare-allowed charges for that same year. 42 C.F.R. § 412.84(g)-(h); JA__-AR4397-98. Expressed as a fraction, a CCR comprises a hospital's:

<u>Total fiscal year Medicare costs</u><br>
Total fiscal year Medicare charges

This Court has described the CCR as representing a hospital's "average markup," which is "key" because "outlier payments are available only 'where charges, adjusted to cost, exceed' the [sum of the threshold and ordinary case payments]." *See Dist. Hosp. Partners*, 786 F.3d at 50 (citation omitted).

HHS had numerous possible data sources to compute the CCRs. Ranging from the most-current to least-current sources, HHS's options were: (1) cost reports contemporaneous with billed claims (which would have required adjusting some outlier payments after the close of a hospital fiscal year, a process followed

5

for other supplemental IPPS payment programs);[5] (2) the most recent "as-filed" cost reports (available about 5 months after a hospital's fiscal year end); (3) tentatively settled cost reports (available about 9 months after the hospital's fiscal year end); or (4) audited and settled cost reports (available about 2-5 years after the hospital's fiscal year end). JA___-AR 7387; JA___-AR 6844.

In 1988, HHS selected the least current source of CCRs, settled cost reports. JA___-AR 7380; JA___-4386. HHS knew its choice to use 2-5 year old CCRs was problematic if a hospital's charges did not increase substantially in lockstep with its cost increases. Specifically, if charges increased at a rate *faster* than costs, then the stale CCR would reflect none of the intervening charge increases and corresponding drop in the CCR. Thus, the stale CCR, when multiplied by high charges at claim submission, would generate overstated costs per case.

HHS acknowledged the danger of using stale CCRs:

> Since **both the [CCR] … and the threshold are constant** for the payment period, **the payment received by the hospital can be increased by increasing charges**. In addition, hospitals can conceivably change their charge structures, just as is the case at present, to maximize their outlier payments.

JA___-AR 7389 (emphasis added).

---

[5] *See, e.g.*, DSH and IME supplemental payment programs. 42 U.S.C. § 1395ww(d)(5)(B) & (F). Using contemporaneous cost reports would have been the least subject to abuse because of the combined use of contemporaneous CCRs and audit adjustments.

6

Comments on HHS's 1988 rulemaking echoed that HHS's proposal created an "incentive for hospitals to increase their charges and to manipulate their charge structures," JA__-AR 7389, and could lead to inaccuracy and abuse. *See* JA__-AR 7387 (expressing concern about "timeliness of the data" and the potential for "significant fluctuations in the ratios and that the data would not reflect current [CCRs]."); JA__-AR 6840 ("Prior period ratios may not adequately represent current period ratios"); JA__-AR 7156 ("not unusual" for settled costs reports to be 5-6 years out of date and "inappropriately inaccurate for determination of cost outliers").

HHS disregarded these warnings and finalized the requirement for hospital CCRs to be based on stale data from settled cost reports. HHS rationalized this choice based on three external factors it believed would keep the lid on charges. JA__-AR 7389-90. HHS based its payment system on the assumption that these mitigating factors would prevent hospitals from spiking their charges to increase outlier payments and, thus, that charges and costs would move in parallel. *Id.*

Further, HHS decided that, if any hospital's CCR fell too low (three standard deviations below the national average CCR), it would automatically be defaulted to a much higher statewide average. 42 C.F.R. § 412.84(g)-(h) (1997-2002); *see, e.g.*, JA__-AR 4949. In 1994, commenters warned: "[T]he minimum [statewide average] threshold creates a clear incentive for hospitals to artificially inflate their

7

gross charges, and circumvent the intent that hospitals only be paid marginal costs for outliers." JA__-AR 6685. HHS responded that if hospitals wanted to increase their payments, the incentive would be to *decrease* their charges and generate higher CCRs. *Id.* This response demonstrates HHS misunderstood its own model. *See infra* 80.

Thus, HHS's outlier payment regulations relied heavily on the assumption hospitals would not exploit the known loopholes through hyper-inflating their charges or, as it would later be known, "turbo-charging." *See Dist. Hosp. Partners*, 786 F.3d at 51. HHS's factual predicate proved faulty.

   b. <u>For FYs 1997-2003, HHS repeatedly hyper-inflated the threshold, in total by 246%, in a misguided countermeasure to unprecedented overpayments, without examining the root cause (turbo-charging) or considering the negative impact on the rest of the hospitals</u>

HHS established each FY's threshold by rulemaking. HHS's FY 1997 rulemaking describes HHS's basic model, reapplied in FYs 1998-2002. To project the FY 1997 threshold, HHS used <u>two</u> data files: the FY 1995 "MedPar file" (containing data on billed charges) and the FY 1995 "provider-specific file" (containing hospital-specific payment parameters, such as CCRs). HHS inflated the MedPAR data to FY 1997 using a <u>cost</u> inflation factor. HHS had recently switched from applying a <u>charge</u> inflation factor because it believed cost inflation

would "account[] for any changes in the [CCRs] that may occur …."  JA__-AR 5584-85.

Thus, entering FY 1997 and through FY 2003, HHS assumed that it could reliably project hospital costs using historical data, because it assumed that (1) charges would generally move proportionately with costs, (2) the ability of hospitals to turbo-charge was effectively mitigated by other factors, and (3) that any CCR fluctuations (in instances where charges were rising faster than costs) were neutralized by HHS's use of a cost inflation methodology.

However, with HHS persisting in using this same model, "[t]he outlier payment system began to break down in the late 1990s." *Dist. Hosp. Partners*, 786 F.3d at 51.  A small minority of hospitals – turbo-chargers – "manipulate[d] the outlier regulations" where their charges were "not sufficiently comparable in magnitude to their costs." *Id.*

If HHS's modeling assumptions were correct, total outlier payments should have been somewhere close its 5.1% projections.  However, from FYs 1997-2002, HHS's outlier regulations yielded massive overpayments (later attributable to turbo-charging), totaling $9.3 billion beyond HHS's 5.1% projections.  HHS summarized this:

| Fiscal year | Outlier percentage | Payments in excess of target of 5.1 percent¹ (in billions of dollars) | Outlier threshold | Threshold that would have paid out 5.1 percent |
|---|---|---|---|---|
| 1997 | 5.5 | $0.3 | $9,700 | |
| 1998 | 6.5 | 1.0 | 11,050 | |
| 1999 | 7.6 | 1.8 | 11,100 | |
| 2000 | 7.6 | 1.8 | 14,050 | 21,825 |
| 2001 | 7.7 | 1.9 | 17,560 | 26,200 |
| 2002 | 7.9 | 2.5 | 21,025 | (²) |
| 2003 | 6.1 | (²) | 33,560 | |

¹ All payments are estimated and reflect operating payments only (not capital payments).
² Not available.

JA___-AR 4398.

HHS reacted to the repeated failures of its outlier regulations solely by increasing the threshold, in total by 246% ($9,700 to $33,560), which was over 25 times HHS's own aggregate estimate of hospital cost inflation for the same period:



Critically, while HHS overpaid the few turbo-chargers, its hyper-inflated thresholds chronically underpaid the vast majority of hospitals (including

10

Appellants), whose rates of charge increases were not exceeding the rates of HHS's threshold increases.

The following table summarizes the gulfs between HHS's threshold increases and its own contemporaneous inflation factors and quantifies HHS's misses:

| FY | 1-Year Inflation Factor | Percentage Increase in Threshold from Previous FY | Percentage by which Payment was over 5.1% Target | Citation |
|----|----|----|----|----|
| 1998 | -2.005% | 13.92% | 27.45% | AR 5518.11; 5364 |
| 1999 | -1.724% | 0.45% | 49.02% | AR 5410; 5255 |
| 2000 | 0.00% | 26.58% | 49.02% | AR 5363; 4949 |
| 2001 | 1.80% | 24.91% | 50.98% | AR 5254; 4810 |
| 2002 | 2.80% | 19.80% | 52.94% | AR 4948; 1158 |
| 2003 | 8.82% | 59.62% | 11.76% | AR 4809; 1033 |

Throughout these six years, HHS failed to explain why, despite hyper-inflation of the threshold, its model repeatedly, substantially underestimated total outlier payments. HHS later admitted it "had no idea why …." *See infra* 17. Further, HHS never addressed the fact that its threshold increases bore no relation to its calculated inflation factors. JA__-AR 5607; JA__-AR 5518.11; JA__-AR 5410; JA__-AR 5363; JA__-AR 5254; JA__-AR 4948; JA__-AR 4809.

HHS discounted commenters' opposition to its sharp increases to the threshold by repeatedly responding that the increase was due to missing last year's target. *See* JA__-AR 5363-64 (FY 2000: "the percentage of outlier payments for FY 1998 [and 1999] is higher than we projected. . .'"); JA__-AR 5254-55 (FY

11

2001: same); JA__-AR 4949 (FY 2002: same); JA__-AR 4810 (FY 2003: same).

HHS's response repeatedly begged the question of *why* HHS kept missing its

target.

The only change HHS made to its process was, in FY 2003, reverting to

using a <u>charge</u> (rather than a <u>cost</u>) inflation methodology to inflate historical

claims. *Id.* at 4809. As explained *infra* at 49, this change reintroduced a problem

HHS had expressly corrected in 1994 – and a problem that caused HHS to "bake

in" underpayments for the FYs 2004-2007 at issue.

 3. <u>When FY 2003 started, a Wall Street analyst exposed turbo-charging</u>

In October 2002, the start of FY 2003, a stock market analyst exposed turbo-

charging by a small number of hospitals. *Medicare Outlier Payments to Hospitals:*

*Hearing Before Subcomms. on Appropriations and Labor, Health & Human*

*Services, and Education*, 108th Cong. 108-268, at 4 (2003) ("Scully Testimony").

As HHS later described it, the turbo-chargers rapidly inflated their charges to take

advantage of the fact that their charge increases would not be reflected in their

outdated or defaulted CCRs – precisely as commenters had foretold. *Id.* at 8-9. As

a result, the turbo-chargers' hyper-inflated billed charges were insufficiently

adjusted and yielded hyper-inflated costs and dramatically higher total outlier

payments. *Id.* HHS began identifying the turbo-chargers. *See* JA__-AR

4417.333-334.

4.    In February 2003, HHS approved and sent for OMB review an Interim Final Rule ("IFR") to end turbo-charging and to immediately reduce the turbo-charged threshold

In February 2003, HHS approved and signed for OMB review its Interim Final Rule ("IFR"). The IFR disclosed alternatives to halt the statutorily prohibited payments to turbo-chargers and, critically, to lower the threshold immediately so as to reset the program to conform to congressional intent. As authorized, HHS found "good cause" to waive notice and comment, because "[e]xtending the duration of these payment inequities ... would be contrary to the public interest and could adversely affect the provision of services to Medicare beneficiaries." JA_-AR 4417.396-97. *See also* 42 U.S.C. § 1395hh(b)(2)(c) (authorizing interim final rules upon finding of "good cause" under 5 U.S.C. § 553(b)(3)(B)).

HHS identified 123 turbo-chargers ("about 2 percent of all Medicare-participating hospitals") that, in FY 2003, had already received "21.7 percent of all outlier payments nationally." JA__-AR 4417.373. They had caused "nearly all of the increase in the FY 2003 threshold from FY 2002 ($21,025 to $33,560)" JA__-AR 4417.353.

HHS found that "if hospitals' charges are not sufficiently comparable in magnitude to their costs, the legislative purpose underlying the outlier regulations is thwarted." JA_-AR 4417.352. Thus, reversing course on the key tenets on which it had predicated its 1988 payment regulation, HHS decided it was

13

immediately necessary to (1) use more-recent CCRs, from tentatively settled cost reports and (2) no longer default ultra-low CCRs to a higher statewide average. Further, to eradicate turbo-charging, HHS found it also "necessary" (3) to subject outlier payments to reconciliation upon settlement of cost reports and (4) to charge interest on any reconciled over-payments.  JA_-AR 4417.355-371.

In the IFR, HHS also found that both the statute and the public interest made it immediately necessary to lower the FY 2003 threshold from $33,560 to $20,760. JA_-AR 4417.375-76,4417.396-397.  This was necessary because the corrected payment regulation, thought to end turbo-charging, significantly reduced the amount of projected outlier payments and, thus, the threshold likely to pay out at HHS's 5.1% target.  JA__-AR 4417.376.

HHS made several corrections that neutralized the grossly distorted turbo-chargers' data previously used in its projections.  First, HHS excluded all data concerning the 123 turbo-chargers, both from the data used to model claims and from the data used to compute average charge inflation.  JA__-AR 4417.371-376. Second, HHS adjusted the CCRs used to set the threshold in order "to project what hospitals' [CCRs] will [later] be when their cost reports are settled."  JA__-AR 4417.375.  In particular, HHS "calculated the average annual rate of change in national case-weighted [CCRs] over the most recent 3 prior years" and "applied these factors to the [CCRs] in [its] files to trend them forward 3 years (from FY

14

2000 to FY 2003)."[6]  *Id*.  Third, for 43 hospitals that had defaulted to the statewide average, HHS computed their actual CCRs (also trended forward to FY 2003). JA__-AR 4417.374.

Finally, the IFR set forth HHS's "Quantitative Analysis" of the impact of these necessary changes.  HHS found that "most categories of hospitals experience significant positive payment impacts due to reducing the [thresholds]," including the redistribution, during remaining FY 2003, of "approximately $420 million" in outlier payments away from the 123 turbo-chargers to other hospitals.  JA__-AR 4417.390-391.

>    5.    <u>During OMB review, HHS repackaged the IFR as a proposed rule, but deleted mention of HHS's efforts to neutralize the turbo-charged data and HHS's conclusion that it must immediately lower the threshold</u>

The IFR disappeared and, two weeks later, HHS instead issued a notice of proposed rulemaking ("NPRM") proposing the IFR's four corrections to the outlier payment regulations, but omitting any mention of the IFR or HHS's finding and considered alternative that it was immediately "necessary" to lower the 2003 threshold.  JA__-AR 4386-4395.[7]  The NPRM also deleted HHS's findings as to

---

[6] That HHS knew how to adjust projection CCRs to what they would later be when used to pay claims is central to the analysis of HHS's arbitrary and capricious actions in FYs 2004-2007.  *See infra* 63-64, 67, 70-71, 75-76.

[7] The IFR and NPRM share the same regulatory identification number (0938-AM4l) and signature dates (January 24, 2003 for Administrator Scully and February 6, 2003 for Secretary Thompson.).  JA__AR4417.402, 4395.

15

the benefits of neutralizing the turbo-charged data and that it was contrary to the

public interest to delay implementing those changes.  JA__AR4417.395-97.

Opposite to its conclusion in the IFR that it was immediately necessary to

lower the FY 2003 threshold, HHS told the public:

> Because of the extreme uncertainty regarding the effects of aggressive
> hospital charging practices on FY 2003 outlier payments to date, we
> are proposing no change to the FY 2003 [threshold] …. However, …
> data for the first quarter of FY 2003 inpatient claims will be available
> soon, and these data may allow us to evaluate the current [threshold]
> and whether outlier payments to date appear to be approximately 5.1
> percent of the total DRG payments.

JA__-AR 4393.

Contrary to HHS's assertion that it was awaiting data from FY 2003, the IFR

based several significant quantitative findings on first-quarter FY 2003 data, *e.g.*,

that 2% of the hospitals were getting 21.7% of the outlier payments.  *See* JA__-AR

4417.373.

### 6.    CMS Administrator Scully testified that OMB had overruled HHS's decision to lower the turbo-charged threshold

Six days after the NPRM, CMS Administrator Thomas Scully testified

before a U.S. Senate Subcommittee, contradicted many of HHS's statements in the

NPRM, and admitted HHS's past failures:

> We consistently missed the targets. We did not understand why. We
> kept raising the bar to get into this outlier pot on the theory that if we
> raised the bar we would actually get closer to the target, and we kept
> missing and missing, and really never understood the dynamics.

16

Scully Testimony at 4.  He gave examples of "some particularly egregious" turbo-

chargers:

> … Doctors Hospital in Modesto, California—… a pretty standard community hospital—received $29 million in 2002 in regular standard Medicare payments. They received $62.5 million of outlier payments, so 215 percent. Instead of 5 percent they got 215 percent of outlier payments….

> … 3 percent of hospitals, about 123, have outlier payments that are way, way beyond anything that is rational or understandable to us.

*Id*. at 5.  He refuted HHS's assertion in the NPRM that there was "extreme

uncertainty" surrounding the effects of turbo-charging:

> [T]he behavior of a few hundred hospitals — those that took advantage of the outlier program – are the main cause of the sharp increases in the loss threshold.

*Id*. at 7.

> He emphasized the consequences of HHS's hyper-inflated thresholds:

> As outlier claims increased (and the agency had no idea why) the outlier threshold has skyrocketed - from $14,050 in 2000 to $33,560 in 2003 - as the agency raised the bar to try (very unsuccessfully) to stay within the 5.1 percent target.  As a direct result, more hospitals have been forced to absorb the costs of the complex cases they treat, while a relatively small number of hospitals that have been aggressively gaming the current rules benefit by getting a hugely disproportionate share of outlier payments.

*Id.* at 7.

Administrator Scully also testified that the proposed changes to the payment

regulation "would prevent further gaming of the system by a few hospitals," *id*. at

11, and that he "felt strongly that … we should lower the threshold back to $22,000 or $23,000," *id.* at 12.  However, because of pressure from OMB, HHS had "agreed in the draft rule to leave it where it was."  *Id*. at 12-13.

He also disclosed that a "large hospital system" (the subject of the stock analyst's report) had agreed to "quit billing for [outlier payments], effective January 1, 2003, saving the system "$57 million per month."  *Id.* at 5.

> 7.    <u>In June 2003, HHS issued an outlier correction rule to halt turbo-charging, but failed to address the alternatives HHS had considered critical to resetting the program to Congress's intent, including immediately lowering the hyper-inflated threshold</u>

After knowingly continuing to pay turbo-chargers for another 4-5 months, HHS issued a final rule that adopted the four proposed corrections to the payment regulation (outlier correction rule).  However, HHS again omitted any mention and made none of the IFR's corrections to the threshold, despite many comments so urging.  *See, e.g.,* JA__-AR 2031 (recommending that threshold be lowered to $18,065); JA__-AR 2567 ("CMS should reduce the [threshold] to reflect the estimated impact on outlier payments during the remainder of fiscal year 2003"); JA__-AR 2540 (recommending threshold be reduced "to around $22,000 if not lower."); JA__-AR 2567 (MedPAC noting that "[f]ailing to adjust the threshold would continue to deny inappropriately additional payments to hospitals that have extraordinarily costly cases, thus thwarting the legislative purpose of the policy").

18

One comment, unknowingly tracking the IFR's admission that turbo-chargers drove "nearly all" of the FYs 2002-2003 threshold increase, suggested HHS "lower the threshold close to the FY 2002 amount" – "it was not the intent of the Congress to have such a high outlier threshold for those hospitals that did not try to manipulate the outlier system and have sustained high losses for true outlier cases." JA__AR 4407.

Because HHS had proposed no decrease to the threshold, commenters, including the leading hospital associations in a joint comment, requested supporting data:

> The absence of any quantitative data in the proposed rulemaking regarding the effects of the proposed payment changes on hospital payments makes it very difficult for us and our member hospitals to provide … meaningful comment…. These data are absolutely critical to assessing the impact of the proposed regulation on our hospitals and the patients we serve.

*See* JA__-AR 2208-09.  HHS provided nothing.

Instead, HHS claimed that, even "after accounting for the changes" to the payment regulations, its modeling supported <u>raising</u> the FY 2003 threshold by $600, but HHS had decided to leave it at its turbo-charged peak of $33,560.  JA__-AR 4407.  Critically, HHS's description reveals no effort to neutralize the historically turbo-charged data.  *Id.*

19

Finally, HHS represented that the <u>only</u> other alternatives it had considered were: (1) "to not make any changes;" (2) to base hospitals' CCRs "on their rates-of-increase in charges as an alternative to reconciling outlier payments;" and (3) to "eliminat[e] the application of statewide average [CCRs] altogether."  JA__-AR 4416.

        8.    <u>Although touting that turbo-charging was now history, HHS still used historically turbo-charged data to set a FY 2004 threshold at close to the turbo-charged peak, thus generating total outlier payments of less than 70% of HHS's target</u>

For FY 2004, HHS decreased the threshold only slightly from the $33,560 turbo-charged peak to $31,000,  JA__-AR 1157,  a far cry from HHS's undisclosed findings in the IFR that the threshold was 60% over-inflated due to 123 turbo-chargers and that a corrected threshold should have been $20,760.  JA__-AR 4417.376, JA__-AR 4417.396-397.

Despite touting that the outlier correction rule had eradicated any future turbo-charging, HHS set the FY 2004 threshold using historically turbo-charged data.  HHS projected outlier claims using historically turbo-charged MedPAR data (from FY 2002), which it inflated by a 26.8% charge inflation factor, derived from additional historically turbo-charged data (from FYs 2000-2002).  JA__-AR 1156. The correction rule now required CCRs from tentatively settled cost reports, which HHS replicated "from the most recent cost reporting year," which "for most

20

hospitals" was from FY 2000.  *Id.*[8]  Thus, the FY 2000 vintage CCRs HHS

actually used were too high as they reflected none of the almost 60% charge

inflation HHS found and projected from FYs 2000 to 2004.

Further, the correction rule stated that reconciliation of outlier payments was

necessary (along with charging interest) to end turbo-charging.  However, HHS

purported to account for the effect of reconciliation by identifying only

approximately 50 hospitals it "believe[d] would be reconciled" for which HHS

"attempted to project each hospital's [CCR] ...."  JA__-AR 1156-57.

Commenters warned that failing to adjust for the turbo-charged data would

generate inaccuracies.  *See* JA__-AR 1157 (modeling a threshold of $25,375, even

without factoring in reconciliation, which also needed to be factored in and "would

further lower the outlier threshold"); *id.* ("request[ing] that CMS factor in the

calculation of the threshold the fact that certain hospitals have distorted their

charges significantly."); JA__AR__Dkt.No.127, at Ex. 6, at 3 (explaining HHS

"will inappropriately overstate the outlier threshold by increasing the charges by

27.3% without considering the change in the [CCR] of such charge increase").

HHS's blanket response was "the final threshold is 37 percent lower [than

the $50,645 proposed prior to the correction rule].…  This reduction … will allow

---

[8] Below, the Hospitals sought the addition of the data HHS had used to compute
these CCRs.  However, HHS represented that it had lost its work papers and had
overwritten any data it had actually used.  *See infra* 27.

hospitals that have been negatively impacted by the increase in the FY 2003

threshold due to [turbo-charging] to qualify for higher outlier payments due to the

lower threshold." *Id*. This response was off point. Because HHS had issued its

proposed threshold *before* finalizing the outlier correction rule, the 37% reduction

did not address the specific flaws noted by the commenters. Indeed, HHS's

$50,645 proposed threshold represented more than a 50% increase in the already

hyper-inflated FY 2003 threshold and a 422% increase from 1997. JA_AR 1111.

It would literally have been off the chart *supra* on 10. HHS later estimated its

$31,000 threshold had paid only 3.52% (or less than 70%) of its target for FY

2004. JA__-AR 660.

> 9.  In FY 2005, HHS set another inflated threshold – again using data
>     distorted by historical turbo-charging, CCRs known to be excessive,
>     and without accounting for reconciliation – which paid out only 77%
>     of the 5.1% target

Despite then estimating that the FY 2004 threshold was underpaying, HHS

proposed to raise the FY 2005 threshold to $35,085. JA__-AR 970-71.

Commenters criticized the steep proposed increase and HHS's ongoing reliance on

historically turbo-charged data. *See* JA__-AR 958.15-16. Commenters noted HHS

was failing to account either for the recognized trend of decline in CCRs or for

reconciliation and, thus, was projecting excessive costs and setting an excessive

threshold. JA__-AR 958.14-18. Comments (based on the proposed rulemaking)

noted that when HHS used more recent data for the final rule, the threshold would

be even lower.  *Id.*

In the final regulation, HHS used more recent data to calculate charge

inflation.  JA__-AR 1032.  Although that data remained distorted by historical

turbo-charging in the second half of FY 2003, it did drop HHS's inflation factor

from 31.1% to 18.76%, a decrease of almost 40%, thus underscoring the

importance of neutralizing historically turbo-charged data.  However, HHS again

refused to adopt the other recommendations that would have further materially

lowered the threshold (*viz.,* adjusting for the pronounced declining trend in CCRs

or factoring in reconciliation's impact).  JA__-AR 1032-33.  The final FY 2005

threshold ($25,800) yielded outlier payments totaling only 3.96% of total DRG

payments, or 77% of the 5.1% target.  JA__-AR 8234.

     10.    <u>HHS's FY 2006 threshold again used excessive CCRs and failed to account for reconciliation and again paid out well below the 5.1% target</u>

HHS's proposed threshold for FY 2006 of $26,675 again failed to adjust the

CCRs or account for reconciliation.  JA__-AR609-10.  Commenters again noted

these flaws.  JA__-AR 377-8; JA__-AR 266-67; JA__-AR 406-07; JA__-AR 379;

JA__-AR 394-95.

HHS's final threshold was $23,600.  JA__-AR 658.  This reduction was due

solely to HHS's use of one-quarter's more recent data to compute the charge

inflation factor and to derive CCRs.  However, because HHS refused to change its

methodology as commenters had urged (to account for declining CCRs and

reconciliation), HHS's threshold again underpaid – only 4.65% of its 5.1% target.

72 Fed. Reg. 47,130, 47,420 (Aug. 22, 2007).

> 11.   <u>For its FY 2007 threshold, HHS finally acknowledged needing to
> adjust the projection CCRs, but applied a miniscule adjustment
> compared to the actual record trend of decline, and still failed to
> account for reconciliation's impact</u>

For FY 2007, HHS proposed using the same methodology and to <u>raise</u> the

threshold to $25,530.  JA__-AR 8145-46.  Commenters again urged that HHS

adjust the CCRs and account for reconciliation.  JA__-AR 8232; *see also* JA__-

AR7452-53,7707-12.

Finally, HHS's published rule conceded the need to apply an adjustment

factor to the CCRs.  However, HHS modeled a token adjustment factor compared

to what commenters had suggested and to the known record trend of decline,

which was seven times greater.  JA__-AR 8232.  Despite estimating significant

underpayments in FYs 2004-2006, HHS <u>increased</u> the threshold for 2007 to

$24,485.  71 Fed. Reg. 59,886, 59,890 (Oct. 11, 2006).  This threshold again

underpaid, at only 4.64% of the actual total DRG payments.  73 Fed. Reg. 48,434,

48,766 (Aug. 19, 2008).

24

12.   <u>HHS's FYs 2004-2007 rulemakings repeatedly asserted the impact of
reconciliation was negligible, but failed to disclose that outlier claims
totaling $664M had been referred for reconciliation</u>

In the correction rule, HHS made outlier payments subject to reconciliation

upon settlement of hospital cost reports, because "reconciliation is necessary" as

"the most appropriate way to ensure that outlier payments are made only for truly

costly cases," JA__-AR 4403, 4405.  Through FY 2007, however, HHS

consistently refused to account for reconciliation's impact (that some payments

would be recouped with interest) in its thresholds, primarily claiming the impact

would likely be minimal.  In 2012, however, the HHS Office of Inspector General

(OIG) revealed a different reason for HHS's failure to account for the impact of

reconciliation.  *[CMS] Did Not Reconcile Medicare Outlier Payments In*

*Accordance with Federal Regulations and Guidance*, (A-07-10-02764), *available*

*at* https://oig.hhs.gov/oas/reports/region7/71002764.pdf ("OIG Report").  Although

HHS had identified $664M in unreconciled outlier payments, it had not performed

any reconciliation.  *Id.*, at ii, 9.  Thus, HHS lacked any data to back up its repeated

assertion that the impact of reconciliation was a trifling matter it could ignore.

B.    **Procedural Background**

1.    The Hospitals' motion to compel revealed that HHS failed to preserve
key records relating to the pivotal 2003 correction rule and FY 2004
rulemakings

The Hospitals moved to compel the complete administrative record.  *Banner Health v. Sebelius*, 126 F. Supp. 3d 28, 56-57 (D.D.C. Sept. 2, 2015) (CKK), JA___-Dkt.No.150, at 37-38 ("Banner").  This motion revealed that HHS failed to preserve several key administrative records relating to the 2003 correction rule and the FY 2004 threshold rule:

- The Impact File used to recalculate the threshold mid-2003.  HHS's "Impact Files" contained assumptions it used to calculate each threshold.  *See, infra* 89 n.30.  For its mid-2003 calculation, however, HHS could produce only an unidentified spreadsheet and could not represent what it comprised or what purpose, if any, it might have served.  JA___-Dkt.No.93-1, at ¶¶ 10, 13.

- "[P]ublic comments received during the [FY 2004 rulemaking]." *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 19 (D.D.C. May 16, 2013) (CKK), JA___- Dkt.No.83, at 23.  Three to five boxes of comments are believed to be missing.  *Banner Health*, 945 F. Supp. 2d at 22-23; *see also* JA___-Dkt.No.39-1, at ¶6.

26

- <u>HHS's data and supporting work papers used to compute the CCRs applied in its FY 2004 threshold rulemaking</u>.  JA__-Dkt.No.93, at 20; JA__-Dkt.No.93-1, at ¶ 21.

As explained *infra*, these documents' absence supports the Hospitals' challenges.

2.     <u>The district court denied the Hospitals' motion to amend the complaint to add a procedural challenge</u>

The district court denied "as futile" the Hospitals motion for leave to amend their complaint to add allegations and claims under 5 U.S.C. §553 regarding HHS's failure to disclose the IFR.  *Banner Health v. Burwell*, 55 F. Supp. 3d 1, 12 (D.D.C. July 7, 2014) (CKK), JA__-Dkt.No.117, at 16.

3.     <u>*District Hospital Partners'* Remand Of The FY 2004 Threshold And HHS's Remand Explanation</u>

In *District Hospital Partners, L.P. v. Burwell*, this Court found that HHS's "promulgation of the 2004 outlier threshold violated the APA" because HHS had failed to explain what it had done to address the data of 123 identified turbo-chargers.  786 F.3d at 58.  The Court remanded that rulemaking with three specific directives, aimed at requiring HHS to explain how it had adequately "corrected for" the turbo-chargers' data.  *Id.* at 58, 60.  The Court also affirmed HHS's FYs 2005 and 2006 rulemakings.  *Id.* at 60-63.

27

The district court below incorporated but one of these three directives in its remand order.  JA__-Dkt.Nos.149-50.  (That order otherwise denied the Hospitals' motion for summary judgment, as well as the Hospitals' request for the court to consider additional documents outside of the administrative record.  Banner, JA__-Dkt.No.150, at 43-50, 119-20.)

HHS's remand explanation stated it had adequately addressed the turbo-charged data and that it would "not recalculat[e] the FY 2004 … threshold."  81 Fed. Reg. 3,727, 3,728-29 (Jan. 22, 2016).  The district court accepted HHS's explanation.  *Banner Health v. Burwell*, 2016 U.S. Dist. LEXIS 42787, at *4 (D.D.C. Mar. 31, 2016) (CKK), JA__-Dkt.No.164, at 2-3 ("Remand Op.").

## VI.    SUMMARY OF THE ARGUMENT

HHS's outlier regulations, promulgated in 1988 and reapplied along with its annual threshold regulations over FYs 1997-2003, drove the outlier payment system farther and farther off its congressionally mandated tracks by hyper-inflating thresholds to keep up with a tiny fraction of turbo-charging hospitals. The turbo-chargers received over $9 billion in overpayments, while those same hyper-inflated thresholds caused most other hospitals to be chronically underpaid.

Worse still, when forced in early FY 2003 to confront this reality, HHS considered but then silently abandoned the immediate corrections necessary to put the program back on track consistent with Congress's intent.  Instead, and despite

28

touting the demise of turbo-charging, HHS allowed historically turbo-charged and other faulty data to infect its thresholds in mid-FY 2003 and future years.

Thus, for all of the years at issue, HHS effectively shredded the safety net Congress had intended to provide for hospitals treating exceptionally costly patients and repeatedly violated well-established APA principles.

An agency must examine the relevant data – including data on the efficacy of prior years' regulations, methodology and factual assumptions – and may not, without rational grounds, ignore more recent, better data.  But HHS set its thresholds using faulty data, without explanation, when corrective adjustments to the data, more suitable data, or both were available.

Likewise, agencies may not ignore important aspects of a regulatory problem or regulate contrary to congressional intent.   But HHS repeatedly ignored the failures of its predictive methodology and kept reusing it to set thresholds that were not "likely produce aggregate outlier payments" at HHS's 5.1% target or within the statutory range.  *Cnty. of L.A.*, 192 F.3d at 1013.

HHS's violations of the APA were especially acute in the mid-2003 outlier correction rule and the subsequent threshold rulemakings. Significantly, HHS knew that, due to turbo-charging, from FY 2002 to FY 2003 alone it had inflated the threshold by 60%.  Yet even after the turbo-charging jig was up, HHS maintained a hyper-inflated threshold for the rest of FY 2003 and for FY 2004.

29

This Court has already remanded the FY 2004 threshold because HHS failed to explain how it had accounted for historically turbo-charged data that year. That same rationale applies, *a fortiori*, to HHS's decision mid-FY 2003 to leave the threshold at its turbo-charged peak – especially where HHS did not explain whether and how it neutralized the turbo-charged data or why it had rejected the alternatives considered of immediately lowering the threshold to FY 2002 levels. Even including HHS's remand explanation for FY 2004, the rulemaking record contains no rational explanation for permitting turbo-charged data to continue to skew the threshold.

HHS also allowed historical turbo-charging to infect its FY 2005 threshold. That rulemaking, along with HHS's FYs 2006-2007 rulemakings, also suffered from two other known data distortions that HHS stubbornly refused to correct. HHS used older, higher CCRs to project the threshold (projection CCRs) that it knew would be replaced by more recent, materially lower CCRs used to pay claims. HHS knew that, without proper adjustment, the projection CCRs would be too high, overstate costs, and generate excessively high thresholds. Nevertheless, HHS refused to adjust the projection CCRs for FYs 2005-2006. When it finally conceded the point in FY 2007, HHS made only a token adjustment based on a modeled trend that contradicted the actual record data.

HHS's 2003 correction rule provided for audit and reconciliation (with interest) of outlier overpayments, stating these were <u>necessary</u> to prevent further turbo-charging.  For FYs 2005-2007, however, HHS refused to account for the impact of reconciliation, claiming reconciliation was both hard to predict and would be trifling.  These claims were contradicted by HHS's admission, years later, to its OIG – *viz.*, HHS had let $664 million in outlier claims subject to reconciliation pile up before it ever developed a system to conduct reconciliation. Thereby, HHS skewed the FYs 2005-2007 thresholds with projections of outlier claims it would later recoup.

In sum, from mid-FY 2003 through FY 2007, HHS failed to return the outlier payment system to its congressionally mandated tracks.

Accordingly, HHS's regulations governing outlier payments for FYs 1998-2007 are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under 5 U.S.C. § 706.

Finally, the district court abused its discretion in denying the Hospitals' motion to amend their complaint to challenge HHS's failure to disclose the IFR in its 2003 outlier correction rule and in denying the Hospitals' motion for consideration of three exhibits summarizing record data and certain extra-record evidence.

## VII.  STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*.  *Deppenbrook v. Pension Benefit Guar. Corp.*, 778 F.3d 166, 171 (D.C. Cir. 2015).  Where the dispute involves the review of agency action, the Court "review[s] the administrative record" directly and "accord[s] no particular deference to the judgment of the District Court."  *Id.* (internal quotation marks omitted).  This Court will overturn summary judgment for the agency if it "violated the Administrative Procedure Act by taking action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* (quoting 5 U.S.C. § 706(2)).

This Court "review[s] a denial [of leave to amend] based on futility *de novo*," *Levine v. Am. Psychological Ass'n*, 766 F.3d 39, 55 (D.C. Cir. 2014), and a "refusal to supplement the administrative record for abuse of discretion."  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

## VIII.  ARGUMENT

### A.  After Concluding That The FY 2003 Threshold Had Been Turbo-Charged Almost 60%, HHS's Midyear Decision To Leave It At That Peak Violated The APA

When FY 2003 started, HHS faced the reality that it had been paying outlier claims and setting thresholds based on turbo-charged claims that "thwarted" the statute.  JA__-AR 4389.  HHS identified the turbo-chargers and found in the IFR

32

that, just from FY 2002 to FY 2003, turbo-chargers had driven up the threshold by almost 60%. In the IFR, HHS admitted its obligation to bring its outlier payments in line with the statutory directive to pay only high cost (not merely high charge) cases and to lower the hyper-inflated threshold immediately. HHS's published rulemaking, however, silently abandoned HHS's considered findings and alternatives aimed at bringing relief to hospitals that had been underpaid every year since at least FY 1998. While HHS revised its payment regulations (to end turbo-charging), it failed to neutralize the historically turbo-charged data, leaving the FY 2003 threshold at its turbo-charged peak.

1.    HHS's decision not to lower the threshold violated the statute

Three clauses of the statute both establish and limit HHS's authority to make outlier payments. First, HHS may make outlier payments only "where charges, adjusted to cost," exceed the threshold. 42 U.S.C § 1395oo(d)(5)(A)(ii). Second, such outlier payments "shall … approximate the marginal cost of care beyond the" threshold (plus the ordinary case payments). *Id.* at (d)(5)(A)(iii). Importantly, "paragraph (5)(A)(iii) employs mandatory language of the sort not normally used if all that Congress intended to do was to offer a discretionary guideline for [HHS] to follow." *Cnty. of L.A.*, 192 F.3d at 1018. Third, HHS must set thresholds that "will likely produce aggregate outlier payments totaling between five and six percent of projected or estimated DRG related payments." *Id.* at 1013(emphasis

33

added); 42 U.S.C § 1395oo(d)(5)(A)(iv).  Read together, these three clauses ensure that hospitals do not "reap additional compensation over and above the standard DRG payment where treatment costs for a particular discharge were not extraordinarily costly ...."  *Cnty. of L.A.*, 192 F.3d at 1018.[9]

However, by December 2002, HHS <u>knew</u> that it had been redistributing billions in outlier payments to turbo-chargers for high-charge cases with actual "cost[s] of care" below the threshold.  Both in the IFR and the 2003 NPRM that followed two weeks later, HHS admitted that such high charge (but low cost) payments "thwarted" congressional intent.  JA__-AR at 4389, JA__-AR 4417.352.  Thus, in the IFR, HHS concluded that the statute made it immediately "necessary to recalculate the outlier threshold …," JA__-AR 4417.372, and that "[e]xtending the duration of these payment inequities … would be contrary to the public interest and could adversely affect the provision of services to Medicare beneficiaries." JA__-AR 4417.396.

With eyes wide open, however, HHS chose both to continue paying turbo-chargers throughout FY 2003 and to use projections of such unauthorized payments to rationalize keeping the threshold at the turbo-charged $33,560 peak.

---

[9] This congressional intent is expressed both in the statute's plain language and its legislative history, as detailed in the Hospitals' summary judgment briefing.  *See* JA__-Dkt.No.127, at 26-28.

34

Specifically, to project claims, HHS knowingly used historically turbo-charged FY 2002 MedPAR data and distorted it even further with a turbo-charged inflation factor.  JA__-AR 4407; *see also infra* 43.  HHS then multiplied the modeled turbo-charged claims by the turbo-chargers' inaccurately high historical CCRs (including those now indefensibly defaulted to higher statewide averages). These distortions yielded an even higher threshold, rather than lowering it to $20,760.  *See* JA__-AR 4407-08.  Thereby, at least $420 million in outlier payments that should have gone to hospitals treating extraordinary costly patients instead continued to flow to turbo-chargers.  JA__-AR 4417.390-.391.

The IFR evidences HHS's past payments to the 123 hospitals and the benefits of correcting such errors.  JA__-4417.355-56; JA__-AR 4417.373.  HHS also admitted that, in FY 2002, these 123 had reaped more than $1.6 billion in invalid outlier payments.  JA__-Dkt.No.127, at Ex. 3.  Below, HHS did not contest that, even after learning of turbo-charging, it continued to pay identified turbo-chargers for the rest of FY 2003, JA__-Dkt.No.127, at 31-32, and that it continued to underpay all other hospitals, JA__- Dkt.No.45-18 (FY 2003 MedPAR file).

The district court erroneously held HHS's decision not to lower the threshold complied with the statute.  *See* Banner, JA__-Dkt.No.150, at 70-71, 74. The district court reasoned that HHS had reasonably construed "cost" in the statute to mean the "charges adjusted to cost," thereby finding no limitations on how HHS

35

may make such adjustments.  Thus, HHS had no obligation to consider whether it was paying true (or even close to true) costs above the threshold.  *Id.* at 69-71. Effectively, the district court held HHS could ignore whether the actual "cost of care" was ordinary and, instead, pay where costs only appear extraordinary due to known turbo-charging.  This holding both overlooks the plain language of the statute, as construed in *County of L.A.*, and renders meaningless the directive to pay only the "<u>cost</u> of care beyond" the threshold.

Until this lawsuit, HHS agreed with the Hospitals on this issue:  "the Outlier Statute limits outlier payments to extraordinary costs" and (5)(A)(ii)'s "mandate that charges be 'adjusted to cost' clearly reveals Congress'[s] intent that charges, after adjustment, reflect the hospital's incurred cost."  *See* JA__-Amicus Curiae Mem. of U.S.A. 6, *Boca Raton Cmty. Hosp. v. Tenet Healthcare Corp.*, 9:05-cv80183-PAS, ECF No. 47 (S.D. Fla. May 17, 2005).  "Taken together, [(5)(A)(ii) and (iii)] make clear that a hospital may obtain outlier payments only for extraordinarily costly cases, and even then only in an amount that approximates the marginal additional cost incurred by the hospital."  *Id.*

Moreover, the statutory directive establishing HHS's 5-6% range is plainly premised on the "total amount of [outlier payments] for discharges in a fiscal year."  *See* 42 U.S.C. § 1395ww(d)(5)(A)(iv).  That directive must be read together with the statutory limitation on the *types* of cases qualifying for outlier payments.

36

*Cnty. of L.A.*, 192 F.3d at 1014 ("Under *Chevron* step one, we consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part.") (citation omitted). Turbo-charged claims fail to meet the basic definition of an outlier case – where costs exceed the threshold. Thus, although complex in some places, here the Medicare statute plainly does not authorize HHS to make or to project outlier payments for claims when it <u>knows</u> that only charges, but not costs, are exceptionally high. *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 24 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("Complexity in the code as a whole does not mean ambiguity in a specific provision.").

Accordingly, by knowingly paying turbo-charged claims, and including them in its projections of total outlier payments to rationalize not lowering the mid-FY 2003 threshold, HHS failed to "stay[] within the bounds of its statutory authority." *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013); *Sierra Club & La. Envtl. Action Network v. EPA*, 755 F.3d 968, 980 (D.C. Cir. 2014) (rejecting agency action in violation of statute's clear language and legislative intent). Those actions of HHS also invalidly "frustrate[d] the policy that Congress sought to implement." *See Shays v. FEC*, 528 F.3d 914, 925 (D.C. Cir. 2008) (citation omitted).

37

2.    <u>HHS's decision not to lower the threshold was also arbitrary and capricious</u>

In response to HHS's 2003 NPRM, many comments urged that the 2003 threshold immediately be decreased, both to account for the sea change in the payment regulations and to provide long-overdue relief to <u>non</u>-turbo-chargers. *See, e.g.*, JA__-AR2566-68, 1876-77, 2115, 2123-24.  HHS replied that, even "after accounting for the changes" to the payment regulations, its modeling suggested raising the FY 2003 threshold by $600, but HHS would leave it at $33,560.  JA__-AR 4407.  HHS's statement is akin to that of a teacher who catches a handful of students cheating on an exam, but nevertheless decides to let the cheaters keep their perfect scores and to count those scores in setting the curve for all other students.

HHS's decision was arbitrary and capricious for two reasons.  First, HHS failed to address and neutralize the same turbo-charged data for which this Court remanded the FY 2004 threshold.  Second, HHS's explanation does not reflect consideration of, much less rationally explain, the 180-degree pivot from HHS's conclusion in the IFR that it must immediately lower the threshold to $20,760.

This Court held that HHS's FY 2004 threshold violated the APA because HHS had "never even *acknowledged* the possibility of excluding the 123 turbo-charging hospitals from the dataset," a "significant and obvious alternative" HHS

38

should have considered.  *Dist. Hosp. Partners*, 786 F.3d at 59-60.  That holding

applies *a fortiori* to HHS's refusal to lower the FY 2003 threshold.  That decision

both implicated the same 123 turbo-chargers (along with 43 hospitals that had

defaulted to statewide averages) and also relied on the same claims data as in the

FY 2004 rulemaking.  *Compare* JA__-AR 4407 (basing mid-FY 2003 threshold on

FY 2002 MedPAR data), *with* JA__-AR 1156 (basing FY 2004 threshold on FY

2002 MedPAR data).  As with FY 2004, HHS's final 2003 notice does not even

acknowledge the possibility of excluding the 123 turbo-chargers (or the 43) when

recalculating the FY 2003 threshold – they are "nowhere to be found."  *Dist. Hosp.*

*Partners*, 786 F.3d at 58.

　　　　Moreover, HHS's conclusion that the threshold should have been increased

directly contradicts the alternative considered in the IFR that both the statute and

public interest required the threshold be immediately decreased.  HHS neither (a)

explained its consideration of or departure from the adverse findings, data and

alternatives approved in the IFR, nor (b) attempted to reconcile the data before

HHS showing that "nearly all" of the almost 60% increase in the FY 2003

threshold (from FY 2002) was due to turbo-charging.  JA__ AR 4417.353.

　　　　Instead, HHS's explanation reveals no efforts to neutralize the turbo-charged

data from the 123 turbo-chargers, the 43 statewide-average defaulters, or even

from the hospital chain that triggered the investigation that had exposed turbo-

charging.  Given HHS's concession that turbo-charged payments "thwarted"
congressional intent, it was arbitrary and capricious for HHS to continue to model
any turbo-charging for the rest of FY 2003.  HHS also knew that, effective January
1, 2003, the hospital chain had agreed to "quit billing for [outlier payments],"
saving HHS "$57 million a month …."  Scully Testimony at 5.  And, as to all other
turbo-chargers, HHS had expressly reserved the right to assign alternate CCRs no
later than August 8, 2003.  JA__-AR 4401.

However, there is no evidence that HHS factored these significant
developments, which should have substantially decreased the threshold, into its
recalculation mid-2003.  HHS has never described such efforts and has lost or
overwritten the data representing its calculations.  *See supra* 26-27.  The only
available data is in the IFR showing that the 123 turbo-chargers – about 2% of the
hospitals – had received 21.7% of all outlier payments.  JA__-AR 4417.373.

The district court, relying on *District Hospital Partners*, held HHS had no
obligation to explain its departure from the IFR, because it was "never published ...
in the Federal Register."  Banner, JA__-Dkt.No.150, at 102; *see also id.* at 101
("[I]nsofar as Plaintiffs' challenges are based on the draft interim final rule, they
cannot succeed.").  However, *District Hospital Partners* excused only HHS's
failure to address the IFR in <u>subsequent</u> rulemakings, as it never represented final

40

policy.  786 F.3d at 58.  *District Hospital Partners* did not address the IFR's

relevance to the 2003 rulemaking of which it was a part.

As to the 2003 rulemaking, the IFR comprised significant and viable

alternatives that were both known to and considered by HHS.  Indeed, HHS was

required to supplement the administrative record with the IFR because it "reflects

information and alternatives adverse to those finally adopted by [HHS]."

JA__Dkt.No.96 at 11-12.  Thus, HHS was not permitted to ignore such adverse

material without consequence.  To the contrary, as cited by the Hospitals (JA__-

Dkt.No.127, at 59-60), HHS was obligated to demonstrate that it had considered

"reasonably obvious alternatives" and to "explain its reasons for rejecting

alternatives in sufficient detail to permit judicial review."  *Walter O. Boswell*

*Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984); *see also Advocates*

*for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136,

1139-40, 1147 (D.C. Cir. 2005) (an agency must also reasonably explain why it

chose an approach contrary to evidence before it, including well-known, and

considered, reasonable alternatives).  "The failure of an agency to consider obvious

alternatives has led uniformly to reversal."  *Yakima Valley Cablevision, Inc. v.*

*FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986); *see also Nat'l Black Media Coal. v.*

*FCC*, 775 F.2d 342, 357-58 (D.C. Cir. 1985) (agency's failure to consider an

alternative it had previously used comprised flawed decision making); *Pub. Citizen*

41

*& Ctr. for Auto Safety v. Steed*, 733 F.2d 93, 99-100 (D.C. Cir. 1984) (action arbitrary and capricious where agency failed to explain why it could not pursue alternative suggested in a prior proposed rulemaking).

The district court's holding cannot be squared with the foregoing controlling precedent, which demonstrates that it was arbitrary and capricious for HHS to silently abandon the contrary alternatives, data and findings considered in the IFR. "There is no question that [HHS] was aware of [the IFR's] options; the issue is whether [HHS] gave them sufficient consideration and adequately explained [its] decision." *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 n.41 (D.C. Cir. 1983). The record lacks any explanation whatsoever.

The district court also erred in excusing HHS's failure to neutralize the turbo-charged data because no commenter suggested the precise alternatives considered in the IFR. Banner, JA__-Dkt.No.150, at 103. But HHS authored those alternatives so indisputably knew of them. Moreover, despite being kept in the dark as to the data on which HHS relied, commenters had expressly called for lowering the threshold following turbo-charging's exposure. *See supra* 18-19.

Lastly, in deciding not to lower the FY 2003 threshold, HHS exacerbated the already existing data distortions by "inflat[ing] charges from the FY 2002 … MedPAR … file by the 2-year average annual rate of change in charges per case to predict charges for FY 2004." JA__AR 4407 (emphasis added). Thereby, HHS

42

modeled charge growth that would occur in the full year <u>after</u> FY 2003, also using

turbo-charged data.  HHS's error is clear because potential charge increases in FY

2004 were irrelevant to projecting FY 2003 costs and HHS expected that turbo-

charging would end in FY 2003.

Below, HHS did not deny that projecting inflation into FY 2004 would have

been arbitrary and capricious.  However, based solely on counsel's *post hoc*

assertion, the district court held that HHS's statement in the preamble was "self-

evidently" a typo.  Banner, JA__-Dkt.No.150, at 104.  Yet the Federal Register is

clear that HHS inflated the "<u>FY 2002</u> … file" by "<u>2-year[s]</u>" to "<u>FY 2004</u>."

JA__AR 4407 (emphasis added).  HHS merely speculated that the Federal Register

"most likely" contained a typo, without definitively disavowing the otherwise clear

text.  JA__-Dkt.No.132, at 51.  HHS did not produce any actual backup data for its

calculations to support its "typo" theory, and an agency may not supplement (or

contradict) the record with statements in briefs.  *See, e.g., Electricity Consumers*

*Res. Council v. FERC*, 747 F.2d 1511, 1518 (D.C. Cir. 1984); *Select Specialty*

*Hosp. – Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 n.3 (D.C. Cir. 2014).  In

fact, where HHS has *actually* made a typo with respect to the rulemakings here at

issue, it has published a correction in the Federal Register.  *See* 81 FED. REG.

70,980 (Oct. 14, 2016).

In summary, HHS's 2003 rulemaking is arbitrary and capricious for two reasons.  First, HHS did not explain how it had addressed the data distortions from the 123 turbo-chargers it had identified.  *See Dist. Hosp. Partners*, 786 F.3d at 58-59.  Second, HHS failed to demonstrate any consideration of, or to explain its departure from, the IFR's detailed adverse findings, data and alternatives necessitating a much lower threshold, uninfluenced by the effects of past and projected turbo-charging or by inappropriate projections of charge inflation into FY 2004.  *See* authority cited *supra* at 41-42; *see also Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1518 & n.65 (D.C. Cir. 1984) (agency action invalidated, in part, because agency relied on factors Congress has not intended the agency to consider); *Competitive Enter. Inst. & Consumer Alert v. NHTSA*, 956 F.2d 321, 323-24 (D.C. Cir. 1992) (agency's choice to "fudge[] the analysis" and make "conclusory assertions" to justify its decision was arbitrary and capricious because agency should have "seriously examined" the data and "face[d] the trade-off" by estimating the costs and benefits of each option in its analysis).

**B.    HHS Set The FYs 2004-2007 Thresholds Without Adjusting For Data It Knew Was Distorted By Historical Turbo-Charging And By Other Factors, Thus Yielding Thresholds That Were Likely To And Did Pay *Below* HHS's 5.1% Target And The Statutory Minimum**

HHS states the outlier statute "mandates that [HHS] must select outlier thresholds which, when tested against historical data, will likely produce aggregate

outlier payments totaling between five and six percent of projected or estimated DRG related payments."  *Cnty. of L.A.*, 192 F.3d at 1013 (emphasis added).  With its FYs 2004-2007 thresholds, however, HHS put a thumb on the scale when estimating the next year's "costs of care."  This generated excessive thresholds that were likely to <u>under</u>pay the target.

HHS did this by, (1) unreasonably using excessively high CCRs in its projections, (2) knowingly using turbo-charged data to estimate costs, and (3) failing to account for the effect of reconciliation.  As the first error cuts across each of the FYs 2004-2007 rulemakings, it is addressed separately.  The other two errors are addressed, as applicable, in the subsequent discussions of the individual rulemakings.

1.    <u>HHS knew the CCRs it used to project outlier payments were materially higher than the CCRs that would later be used during the upcoming FY to pay claims, thus invalidly "baking in" underpayments</u>

To set the FYs 2004-2007 thresholds, HHS knowingly used excessively high CCRs to project total outlier payments for the upcoming FY.  These excessive CCRs unduly inflated HHS's projections of costs-per-case and total outlier payments, and yielded unduly inflated thresholds.  Below, HHS did not deny that its projections suffered from this significant bias, nor could it.

45

First, HHS had repeatedly observed, both before and during the FYs at issue, that hospital charges were rising faster than costs.  JA__- AR 6590 (FY 1993), 58 Fed. Reg. 46,270, 46,347 (Sept. 1, 1993) (FY 1994), AR 6685 (FY 1995), AR 4809 (FY 2003), AR 4401 (2003), AR 4407 (FY 2004), AR 1032 (FY 2005), AR 609 (FY 2006), AR 8231 (FY 2007).  Thus, each year, the denominator of the CCR fraction (charges) was consistently getting larger relative to the numerator (costs) and CCRs were on average lower than the year before.  The following graph and table summarize the record data showing the uninterrupted trend of decline in the national average CCR.



10

<u>Second</u>, to set its thresholds, HHS sourced CCRs from that year's

March/April update of a data file containing all hospital CCRs (*e.g.*, when setting

the FY <u>2005</u> threshold in summer <u>2004</u>, HHS used the <u>April</u> <u>2004</u> update of the

---

[10] *See* Impact Files for FYs 1997-2007, filed electronically with district court. *See, e.g.*, JA__Dkt.No. 45-12, 45-13, 45-14, 45-15, 45-16, 45-17, 45-18, 39-1, 48-2, 41-1, 39-2, and 45-20. Each Impact File contains HHS's assumptions used in projecting outlier payments, including each hospital's projected operating CCR and projected transfer-adjusted number of Medicare discharges. Each "National Average Operating CCR" figure in the above table is the calculated average operating CCR of the hospitals in each FY's Impact File, weighted by their projected transfer-adjusted number of Medicare discharges. Although the above table accurately summarizes voluminous record data, the district court improperly refused to consider it. *See infra* 91-93.

data file).  JA__AR 1032.[11]  But HHS also knew that, due to the programmatic

timing of CCR updates, <u>all</u> CCRs in the April file would be replaced with newer

(on average one-year newer) and therefore lower CCRs to be used for payment of

claims in the coming year.  JA__-AR 1032; JA__-AR 658;  JA__-AR 8231.  Thus,

HHS knew the CCRs it used to project outlier payments when setting the threshold

(projection CCRs) were necessarily materially higher than the CCRs that would be

used during the coming FY to pay outlier claims (payment CCRs).

HHS knew of this inherent bias in its model to overestimate costs – and thus

to set excessive thresholds that would necessarily underpay – because commenters

repeatedly flagged the problem in the FYs 2004–2007 rulemakings.  For example:

> The present CMS model … will fail to reasonably project outlier
> costs.  Outlier costs are equal to charges times [CCRs].  CMS is
> projecting the charges to increase for FY <u>2006</u> by 18.04% over 2
> years; yet, the [CCRs] are locked as of December <u>2004</u>.  Such a model
> will invariably underpay outliers.

JA__-AR 377 (emphasis added); *see also* JA__-AR 7707-09, JA__-AR 958.15-16,

JA__-Dkt.No.127, at Ex. 6 (similar comments for FYs 2007, 2005 and 2004,

respectively).  The comments were based on HHS's proposed rules, the timing of

which required HHS to use a one-quarter older update file for the projection CCRs.

---

[11] As discussed *infra* 65, *District Hospital Partners* mistakenly concluded that
HHS sourced CCRs from the same database as charges; but CCRs actually come
from a different database, as the record establishes and HHS should readily admit.

Invariably, as HHS observed, the CCRs declined significantly even in that single-quarter period between proposed and final rules.  JA__-AR 659.

Moreover, HHS had previously determined that declining CCRs would automatically trigger excessive thresholds if HHS (as it did for FYs 2004-2007) applied a <u>charge</u> inflation factor to project costs without adjusting the CCRs.  In FY 1994, to account for the trend of declining CCRs, HHS had switched from <u>charge</u> inflation to a <u>cost</u> inflation methodology, stating this would "automatically adjust[] for any changes in the [CCRs] that may occur, since the relevant variable is the costs estimated for a given case."  *See supra* 8-9.  HHS touted this benefit nine times thereafter in the Federal Register.[12]  Yet in FYs 2004-2007, HHS disregarded its prior reasoned conclusions and reverted to using 2-year <u>charge</u> inflation factors (of 26.8%, 18.76%, 14.94% and 16.42%) <u>without</u> accounting for the downward trend in CCRs.

The district court misunderstood the Hospitals as claiming that it was *per se* arbitrary for HHS to use a charge inflation method.  Rather, it was indefensible for HHS to revert to a charge inflation factor without *also* adjusting for the decline in CCRs.  The district court failed to consider this Circuit's holding that an agency may not "ignore the past when the past relates directly to the question at issue."

---

[12] AR 6588, AR 6683, AR 6685, 60 Fed. Reg. 45,778, 45,855 (Sept. 1, 1995), AR 5584-85, AR 5500, AR 5518.11, AR 5389, AR 5410.

*Bellsouth Telcomms., Inc. v. FCC*, 469 F.3d 1052, 1060 (D.C. Cir. 2006).  HHS's

rationalization for reverting to charge inflation was also arbitrary and capricious,

given that it shared the virtually identical rationale as HHS's previous decision for

switching to cost inflation:  charges were rising faster than costs.  *Compare* 58 Fed.

Reg. at 46347 to JA_-AR4809.

 Moreover, HHS's data confirmed that its outlier projections were inflated.

Starting with the FY 2005 rulemaking, HHS saw that the prior FY's threshold

yielded total payments well below the 5.1% target.  JA__-AR 660 (FY 2005, HHS

estimating FY 2004 outlier payments at approximately 30% below target); JA__-

AR 8234 (FY 2006, HHS estimating FY 2005 payments at approximately 20%

below target); JA__-AR8146 (FY 2007, estimating FY 2006 payments at

approximately 20% below target).

 HHS knew how to correct for this bias.  Commenters had repeatedly

suggested that HHS apply an adjustment factor to the CCRs and, in the IFR, HHS

had itself adjusted the CCRs, based on the historical decline in the national average

CCR.  JA__-AR 958.15; JA__-AR 958.82; JA__-AR 377; JA__-AR 394 ; JA__-

AR 4417.375.

 However, despite the known record trends of declining CCRs and inflated

projections, HHS refused to adjust the projection CCRs to account for their

expected and actual decline.  This thumb-on-the-scales approach "baked in"

50

overestimates of outlier payments and, thus, yielded excessive thresholds that were

unlikely to (and did not) "produce aggregate outlier payments totaling between five

and six percent." *Cnty. of L.A.*, 192 F.3d at 1013. HHS regulated contrary to its

statutory directive because it "factor[ed] [more than] the marginal cost of care into

[its] calculus." *Cnty. of L.A.*, 192 F.3d at 1018. At a minimum, it was

unreasonable for HHS to interpret the statute to permit known cost overestimates,

which necessarily resulted in excessive thresholds that would pay below the 5.1%

target and offset from regular payments for each of FYs 2004-2007.

> 2.   HHS's FY 2004 threshold was unreasonably infected by turbo-
>      charged data, as HHS's remand explanation confirms

This Court gave HHS a chance to try to salvage its FY 2004 threshold by

rationally explaining its failure to neutralize turbo-chargers' data. *See Dist. Hosp.

Partners*, 786 F.3d at 58-60. When considering the details of this rulemaking, it is

important not to lose sight of three basic facts:

1.  Due almost exclusively to turbo-charged data, the threshold skyrocketed

from $21,025 in FY 2002 to $33,560 in FY 2003.

2.  HHS believed it had eradicated turbo-charging in FY 2003.

3.  HHS did not lower the FY 2004 threshold back to the FY 2002 level, but

set it at $31,000.

51

HHS's remand explanation fails to articulate a rational basis for leaving the FY 2004 threshold almost at the turbo-charged peak even though turbo-charging was history.  Instead, HHS effectively admits that it unreasonably took insufficient measures to correct for the known distorting effects of historically turbo-charged data, thus electing to perpetuate the harm of underpayments caused by its many years of hyper-inflated thresholds.

The district court below also remanded though with a narrower order. Banner, JA__Dkt.No.150, at 107-08.  Then the district court erroneously accepted HHS's remand explanation as "sufficient" and entered final judgment, which, along with the other summary judgment rulings, is reviewed *de novo*.  *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).  This Court should "accord a somewhat greater degree of scrutiny to" HHS's remand determination as it "arrive[d] at substantially the same conclusion" as before the remand.  *Greyhound Corp. v. ICC*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

>     a.    <u>The district court improperly narrowed this Court's remand order</u>

This Court's remand ordered HHS to: (1) "explain why [HHS] corrected for only 50 turbo-charging hospitals in the 2004 rulemaking rather than for the 123 [] identified in the NPRM;" (2) "explain what additional measures (if any) were taken to account for the distorting effect that turbo-charging hospitals had on the

52

dataset for the 2004 rulemaking;" and (3) "if [HHS] decides that it is appropriate to recalculate the 2004 outlier threshold, [it] should also decide what effect (if any) the recalculation has on the 2005 and 2006 outlier and fixed loss thresholds." *Dist. Hosp. Partners,* 786 F.3d at 60.  The district court below limited its remand order "to explain further why [HHS] did not exclude the 123 identified turbo-charging hospitals from the charge inflation calculation for FY 2004."  Banner, JA__-Dkt.No.150, at 107-08.  However, because this Court ruled that HHS's FY 2004 rulemaking violated the APA, unless this Court's remand order is fully satisfied, the rulemaking remains in violation of the APA.

Accordingly, based on s*tare decisis,* HHS was obligated to satisfy both the remand orders of this Court and the district court.  *See, e.g., Belbacha v. Bush*, 520 F.3d 452, 457 (D.C. Cir. 2008) ("A decision of this court is binding upon a later panel and upon the district court.").

        b.    <u>HHS's remand explanation articulates no rational basis for grossly distorting its calculation of average charge inflation with turbo-chargers' data and for using CCRs calibrated to FY 2000 despite assuming over 60% subsequent charge growth</u>

HHS's remand explanation lacks anything to back up its conclusory assertions that it adequately addressed turbo-charging.  Specifically, HHS lacks any facts or analysis supporting its assertions that it was reasonable (1) to distort its average charge inflation calculation with turbo-chargers' data, and (2) to use

"recent" CCRs, from FY 2000, for all but 50 turbo-chargers, even though it knew of many other turbo-chargers and assumed average charges would increase about 60% from FYs 2000-2004.

(1)    HHS has no excuse for distorting the average charge
       inflation calculation with known turbo-chargers' data

On remand, HHS asserts it "simply did not have strong reason to believe that excluding the 123 hospitals from the charge inflation calculation ... would improve [its] projections." 81 Fed. Reg. at 3,729. The record, however, illustrates it was necessary and feasible to exclude turbo-chargers' hyper-inflated historical data from the charge inflation calculations.[13]

When calculating charge inflation, HHS knew:

- From FYs 1999-2001, the 123 had average charge inflation of 70% (95th-plus percentile), JA__-AR 4389-90, spiking HHS's FY 2003 charge inflation calculation over 17%. JA__-AR 4417.375-7.[14]

- The 123's turbo-charged data was in the FYs 2000-2002 MedPAR files (the height of turbo-charging) used to calculate HHS's 26.8% FY 2004 inflation factor. JA__-AR 1158.

---

[13] HHS later admitted that for FY 2004 it had grossly overestimated charge inflation and had substantially underpaid its target by approximately 30%. JA__-AR 658, 660.

[14] The data from the IFR was before HHS during FY 2004. *See Dist. Hosp. Partners*, 786 F.3d at 55 n.3.

- The 123 could no longer benefit from turbo-charging after FY 2003. JA__-AR4403-4405.

- Although never disclosed by HHS, the charge inflation statistics for the 50 other turbo-chargers and the 43 identified as state-wide-average defaulters would have been comparable to those of the 123 – their charge increases either caused them to default or to become reconciliation candidates.[15]

HHS does not deny that these facts demonstrate that its failure to neutralize the turbo-chargers' data materially distorted its FY 2004 charge inflation calculation.

A simple example demonstrates this impact of such a distortion.  Assume there are ten hospitals.  One of them, like an average turbo-charger, increases its charges by 70%, while each of the other nine only increases its charges by 10%. Including the turbo-charger's aberrant data in the average introduces the false premise that the other nine hospitals each increased their charges by 16%, whereas excluding the aberrant data preserves the actual 10% increase of the nine hospitals. Thus, because HHS expected the 2003 amendments had eradicated turbo-charging,

---

[15] The district court mistakenly found "questions regarding the 50 hospitals … outside the scope" of its remand order.  Remand Op., JA__-Dkt.No.164, at 4 n.4. HHS's remand explanation presents such questions and they fall within the scope of this Court's remand order.

HHS had every reason to believe that excluding turbo-chargers' data would "improve [its] projections."  Instead, by calculating and imputing a falsely excessive charge inflation factor for <u>all</u> hospitals, HHS significantly overestimated the costs of the non-turbo-charging hospitals and, consequently, improperly overinflated the threshold.

Moreover, contrary to HHS's undocumented assertion, excluding turbo-chargers' data from the charge inflation calculation would not have introduced a "different form of distortion into [HHS's] simulations."  81 Fed. Reg. at 3,729; *see also* Remand Op., JA__Dkt.No.164, at 4 (erroneously finding it "sufficient that the agency concluded that *excluding* the 123 hospitals from the data analysis would hurt … the overall quality of the data.").  In the IFR, HHS demonstrated that excluding the 123 <u>entirely</u> from its calculations would not distort its projections – they comprised only 2-3% of total IPPS hospitals and the correction rule would "return [their payments] to historical [non-turbo-charged] levels."  JA__-AR4417.374.

Further, to set the threshold, HHS performed two distinct calculations: (1) of charge inflation (the 2-year average annual rate of change in charges per case), and (2) of total outlier payments (by applying the upcoming FY's rates and policies to the inflated charges).  Nothing prevented HHS from excluding turbo-chargers' data when calculating charge inflation (calculation 1), but still including their claims

56

(*viz.*, their charges neutralized by their properly adjusted, much lower CCRs) when estimating total FY 2004 outlier payments (calculation 2). Thus, HHS did not have to throw the baby out with the bathwater as it has only recently asserted. Nevertheless, HHS chose to pollute its charge inflation calculation with turbo-chargers' data, materially distorting cost projections for all hospitals.

Finally, HHS's remand explanation relies summarily on *post hoc* speculation that excluding turbo-chargers data would not "improve [its] simulations …." 81 Fed. Reg. at 3,729. HHS offers no backup demonstrating its contemporaneous consideration of this aspect of the problem. Only in the IFR did HHS analyze the impact of removing turbo-chargers' data from its charge inflation factor, concluding that was the "most appropriate" approach. Thus, HHS failed to "examine the relevant data and articulate a satisfactory explanation for its action," and also ignored significant alternatives and important aspects of the problem. *Dist. Hosp. Partners*, 786 F.3d at 58-59; *Walter O. Boswell*, 749 F.2d at 797 (citation omitted).

(2)      HHS has failed to articulate a rational basis for not adjusting the CCRs of the 123 turbo-chargers

HHS's remand explanation asserts, for the first time, that it applied specific reconciliation criteria to identify the 50 hospitals that were subject to special CCR adjustments and that those criteria did not apply to all of the 123 known turbo-

57

chargers.  81 Fed. Reg. at 3,728-29.  The district court incorrectly declined to review this new explanation.  Remand Op., JA__Dkt.No.164, at 4.

However, because this explanation is both new and contradicts HHS's prior statements, it should be reviewed.  *See Alpharma*, 460 F.3d at 9 (finding challenges to statements first made on remand were subject to review).  Moreover, whether HHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made" is subject to review.  *Alpharma*, 460 F.3d at 6 (citation omitted).[16]  Finally, *District Hospital Partners* did not decide the validity of HHS's failure to account for turbo-charging's impact on the CCRs used for FY 2004.

Thus, this issue should be reviewed *de novo*, taking into consideration HHS's new explanations on remand.  HHS's explanation fails to justify its decision to equate the 123 known turbo-chargers with non-turbo-charging hospitals in computing their CCRs.

---

[16] The Hospitals challenged HHS's decision only to provide for special adjustments to 50 turbo-chargers and to ignore the decline that would occur with all other hospital CCRs, a challenge the district court rejected.  *See* Banner, JA__-Dkt.No.150, at 109.

58

(a)    HHS's assertion that it used "recent" data from FY 2000 demonstrates the necessity of adjusting the CCRs of the 123 turbo-chargers

Without any supporting data or analysis, HHS's remand explanation states that it did not need to adjust the 123 turbo-chargers' CCRs because HHS used "more recent data for all hospitals" to calculate their CCRs.  81 Fed. Reg. at 3,728. HHS asserts this "reduc[ed] any reason for concern that [CCRs] drawn from older historical data for the 123 hospitals would not reliably approximate the [CCRs] that would be used to pay FY 2004 claims for those 123 hospitals."  *Id.*

The remand explanation ignores that the "more recent data" HHS used for the CCRs came "from FY 2000."  *See* JA__-AR 1156.  HHS knew the 123 had continued to turbo-charge through at least the end of FY 2001 and that turbo-charging had persisted at least throughout FY 2002.  JA__-AR 4389-90.  HHS has never explained the rationality of projecting these 123 turbo-chargers' outlier payments using FY 2000 CCRs when it knew their charges had subsequently been turbo-charged and then inflated even further to FY 2004 by HHS's 26.8% charge inflation factor.  Thus, the record contradicts HHS's assertion that the CCRs that it calculated for the 123 would "reliably approximate" their payment CCRs in FY 2004.  HHS knew their CCRs were far too high and, notwithstanding HHS's expectation that turbo-charging was over, would unreasonably generate projections of turbo-charged outlier payments to the 123.

59

> (b)    Contradicting itself, HHS now claims only 50 hospitals satisfied rigid reconciliation criteria

HHS claims that it applied rigid reconciliation criteria, which "not all" of the 123 turbo-chargers were expected to meet. This assertion both contradicts HHS prior's statements and is unsupported by data differentiating the 123 from the 50.

First, HHS has neither disclosed nor described any data distinguishing the 123 turbo-chargers from the 50. In fact, HHS failed to preserve the data it had used to compute the CCRs calculated in the FY 2004 rulemaking. JA__-Dkt.No.93, at 20; JA__-Dkt.No.93-1, at ¶ 21.

HHS previously stated that it selected the 50 hospitals from its "analysis of hospitals that have been consistently overpaid recently for outliers …." JA__-AR 1156. The *only* such analysis ever disclosed is the one identifying the 123 turbo-chargers – *viz.*, hospitals whose (a) outlier payments had increased by 5% or more relative to DRG payments, (b) average charges had spiked by 70%, (c) average CCRs had dropped by only 2%, and (d) turbo-charging had led both to HHS's hyper-inflation of the threshold and to them receiving the lion's share of outlier payments. HHS has never addressed these record facts demonstrating the 123 were reconciliation candidates.

Second, HHS's new assertion as to rigid reconciliation criteria contradicts the record. The 2003 correction rule stated that HHS was "considering instructing"

intermediaries to employ reconciliation criteria, but HHS did not adopt any rigid

criteria either therein or in the FY 2004 rulemaking.  *Compare* 81 Fed. Reg. at

3,728-29, *with* JA__-AR 4405.  HHS expressly "note[d] that fiscal intermediaries

have discretion under current reconciliation policy to reconcile additional

hospitals' cost reports based on analysis that indicates the outlier payments made

to those hospitals are significantly inaccurate."  JA__-AR 1157.  HHS admits this

confirms its reconciliation criteria were not rigid.  JA__-Dkt.No.161, at 8-9.  The

district court improperly excused this gap in HHS's explanation as simply

providing "more detail[]," Remand Op., JA__-Dkt.No.164, at 4 n.4, but it actually

represents a clear contradiction.[17]

Finally, HHS did not even attempt to demonstrate why the 123 turbo-

chargers would not have satisfied its alleged rigid criteria (a 10 percentage point

change in the hospital's CCR and total outlier payments over $500,000).  Based on

reported statistics, the 123 easily satisfied these criteria.  HHS computed their

CCRs from FY 2000 data and their turbo-charging continued through at least FY

2002,  JA__-AR 1156, so they met the requisite CCR drop.  Further, they met the

_____

[17] Even before receiving the remand explanation, the district court concluded that
HHS's <u>original</u> explanation "adequately explained why [HHS] accounted for
reconciliation with respect to the set of 50 hospitals rather than with respect to all
123 …."  *See* Banner, JA__-Dkt.No.150, at 110.  That holding is contrary to
*District Hospital Partners* and erroneously overlooks the lack of any explanation
or analysis regarding the 123.

61

dollar amount, as "outlier payments for these hospitals [averaged] 24 percent of their total DRG payments," JA__-AR4394, roughly a quarter of all outlier payments in FY 2003 (*i.e.*, they averaged more than $6M in outlier payments).

Because HHS has failed to articulate a rational basis distinguishing the 123 turbo-chargers from the 50 hospitals, and because the record contradicts its explanation, it was arbitrary and capricious not to apply special adjustments to all of the 123 turbo-chargers' CCRs.[18]

> (3)     HHS's remand explanation underscores that HHS needed to adjust the CCRs of *all* hospitals

HHS declared that it computed more current CCRs for all hospitals "to ensure that [its] simulated FY 2004 payments would match up as closely as possible with how FY 2004 claims would actually be paid."  81 Fed. Reg. at 3,728. But HHS computed their CCRs from FY 2000 data.  Thus, the computed CCRs represented a period 3-4 years before the FY 2004 costs that HHS was projecting; critically, a period before average charges increased by roughly 60% (calculated 26.8% increases from FYs 2000-2002 and additional 26.8% imputed increases from FYs 2002-2004).  Thus, HHS could achieve its stated purpose only if it adjusted all of the hospitals' projection CCRs to account for this roughly 60%

---

[18] The same holds true for the 43 defaulters to the state-wide average.

increase in the denominator of the payment CCRs and their consequent material decline.

However, HHS failed to address this important aspect of the problem and, accordingly, baked cost overestimates into its projections.[19]  Therefore, HHS knew in advance that it had set the 2004 FLT much too high.

The district court erroneously held HHS was free to ignore these record facts, allegedly because no commenters had brought them to HHS's attention. However, such a defense, based on lack of comment, is unavailable in as-applied challenges.  *See Weaver v. Fed. Motor Carrier Safety Admin*., 744 F.3d 142, 145 (D.C. Cir. 2014).  Moreover, HHS "retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule … even if no one objects to it during the comment period." *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (citation omitted) ("NRDC").

Further, the Federation of American Hospitals commented that HHS should have accounted for the declining trend in CCRs.[20]  Finally, a few months earlier (in

---

[19] *District Hospital Partners* did not address this challenge.

[20] The district court abused its discretion in refusing to consider this comment.  *See infra* 95-96.  Further, HHS expressly waived any objection to challenges "based on issues that may have been raised in [lost comments]."  JA__Dkt.No.126-1, at 47.

the IFR), HHS had applied exactly this kind of across-the-board CCR adjustment factor, and thus well knew of this alternative.  JA__-AR 4417.375.

*****

After receiving a second chance, HHS has still failed to rationally explain how it dealt with turbo-charged data.  Thus, "no useful purpose [could] be served by allowing [HHS] another shot at the target."  *Greyhound*, 668 F.2d at 1364 (setting aside agency's order after agency failed to provide a reasoned explanation on remand).

> 3. <u>HHS's FY 2005 rulemaking again arbitrarily and capriciously failed to correct for problems presented in FY 2004 and set another excessive threshold</u>

*District Hospital Partners* affirmed HHS's FY 2005 rulemaking.  786 F.3d at 60-62.  There are three reasons why this Court should nevertheless review that rulemaking *de novo*.

First, *District Hospital Partners* ordered that HHS should consider what impact resetting the FY 2004 threshold might have on the FYs 2005 and 2006 thresholds.  *Id.* at 60.  The Hospitals have established that HHS must remove the turbo-chargers' data from the FY 2004 dataset and that the FY 2004 threshold must be lowered.  Thus, HHS's decision not to remove similar turbo-charged data from the FY 2005 dataset should be reviewed *de novo*.

64

Second, *District Hospital Partners* did not have the occasion to rule on HHS's failure in FY 2005 to account for the effects of declining CCRs and for reconciliation as such challenges were not raised therein.

Third, *District Hospital Partners* relied on a mistaken reading of the record facts. The Court found that HHS had derived both the charge inflation factor and the CCRs from the <u>same</u> dataset. *See Dist. Hosp. Partners*, 786 F.3d at 57 n.6. This finding was unfortunately in error, as HHS's statements in the Federal Register and its briefs confirm. The Federal Register explains that HHS based the charge inflation factor on the annual rate of change in charges using historical <u>MedPAR</u> files. JA__-AR 1032. In contrast, HHS sourced the CCRs used to calculate the threshold from a separate dataset: the "April 2004 update" of the Provider-Specific File. *Id.*

Remarkably, despite finding that its FY 2004 threshold was then paying well below its 5.1% target, HHS proposed <u>in</u>creasing the FY 2005 threshold to $35,085. JA__-AR 1031. Commenters noted three obvious flaws in HHS's methodology, flaws that had also plagued the FY 2004 threshold: (1) the data HHS used to set the charge inflation factor was infected by turbo-charging; (2) the higher projection CCRs would materially decline and be replaced by lower payment CCRs prior to and during the upcoming FY; and (3) HHS's projections failed to account for reconciliation. *See* JA__-AR 1031-32; JA__-958.14-.18; JA__-958.80-.86; JA__-

65

1102.007-.008; JA__-1102.051.  HHS's final threshold unreasonably failed to

correct for these flaws.

First, HHS's inflation factor – despite using data from the first half of FY

2003 and the first half of FY 2004 – was still distorted by turbo-charging, as HHS

later admitted.  JA__-AR 659 ("[A]ll of these data reflected charges from

discharges that occurred prior to the effective date of the changes in our outlier

policy").  HHS failed to neutralize the turbo-charged data, and provided no

explanation in the record for such failure, merely claiming it was using the most

recent charge inflation data available.  *See* JA__-AR1032.  Likewise, in its briefs,

HHS did not attempt to defend the fact that its inflation factor included turbo-

charged data.  *See* JA__Dkt. 132 at 57-58.  Given that HHS knew how surgically

to remove only the turbo-charged data, HHS had no excuse for allowing such data

to infect the FY 2005 charge inflation calculation.[21]  *See Walter O. Boswell*, 749

F.2d at 797-98, 802-3 (HHS's failure to reasonably explain why it rejected

alternatives raised by significant public comments violates the APA).

---

[21] *District Hospital Partners* affirmed HHS's decision not to neutralize the turbo-
charged data.  786 F.3d at 61.  However, that holding was based on a mistaken
understanding of what neutralizing the data entailed.  Doing so merely required
identifying the few turbo-chargers (the 123 and their cohort) and excluding their
charges from both MedPAR files used for the inflation calculation.  It did not, as
this Court appeared to believe, require any new or additional projections, which,
anyhow, is not an argument that HHS made below or in the record.

66

010-8258-9442

Second, HHS also unreasonably failed to correct for the fact that the

projection CCRs would decline.  Although neither denying this trend nor the

distortion it created, HHS responded:

> … We have already taken into account the most significant factor in
> the decline in [CCRs], specifically, the change from using the most
> recent final settled cost report to the most recent tentatively settled
> cost report.  Furthermore, we strongly prefer to employ actual data
> rather than projections in estimating the outlier threshold because we
> employ actual data in updating charges, themselves.

JA__-AR 1032.

But using more current CCRs to pay claims helped only to curb turbo-

charging and did not to address the separate problem that HHS's projection CCRs

were too high.  Further, HHS's purported reluctance to use projections contradicts

both HHS's longstanding recognition that, absent adjustment, the declining CCRs

would overestimate outlier payments and its routine reliance on projections in

calculating the thresholds.  *See supra* 8-9.  HHS knew <u>all</u> of the higher projection

CCRs would be replaced with lower payment CCRs, most before the start of the

FY.  Thus, HHS knew the projection CCRs required downward adjustment.  Yet

HHS failed to explain why projections <u>were suitable</u> for inflating charges, <u>but not</u>

similarly <u>suitable</u> for deflating CCRs.  HHS also failed to explain why adjusting

the projection CCRs would make calculating the threshold less accurate, especially

when its failure to do so for the prior FY had caused material underpayment.  HHS

67

has given no rational justification for its actions, as required under the APA's arbitrary and capricious standard. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007); *Shays*, 528 F.3d at 921.

Third, HHS refused to account for reconciliation's impact in its projections, stating: (1) HHS believed reconciliations would be rare; (2) it might be difficult to predict which hospitals would be subject to reconciliation; and (3) HHS assumed the CCRs it was using were reliable. JA__-AR 1033. However, as admitted to its OIG, from 2003-2008, HHS had neither conducted, nor developed a system to perform, any reconciliations, even though its contractors had identified $664 million in claims subject to reconciliation. OIG Report at 20-21.

Thus, HHS's rationalizations for its decision to disregard the impact of reconciliation were based on inaccurate assumptions refuted by the hundreds of millions of dollars of outlier payments, and the hundreds of hospital CCRs, referred for reconciliation. HHS's explanation in the Federal Register lacks any factual predicate and fails to provide a reasonable basis for ignoring the impact of reconciliation. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008) (finding agency's assumption arbitrary and capricious given "absence of any evidentiary basis" in record and agency's "refusals to consider" contrary evidence); *Advocates for Highway & Auto Safety*, 429 F.3d at 1139-40 (agency

action is arbitrary and capricious when it is contrary to the record before it, without a "coherent explanation."); *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobaco, Firearms, & Explosives*, 437 F.3d 75, 81-82 (D.C. Cir. 2006) (holding rule arbitrary and capricious where agency "provided virtually nothing to allow the court to determine whether its judgment reflects reasoned decisionmaking" and supported its conclusion only with appeal to its own "presumed technical expertise and experience.").

The district court did not address the findings of the OIG Report and only concluded that reconciliation was not required by law.  HHS, however, based its decision to ignore reconciliation's impact on assumptions disproved by the OIG Report.  Accordingly, whether or not reconciliation is required has no bearing, as that was not the basis HHS articulated for its decision.  Further, the OIG Report does not comprise *post hoc* facts and conclusively demonstrates that HHS's published responses to comments were speculative and inconsistent with APA standards.

As a result of its unreasonable refusal to correct the three known flaws in its methodology, HHS set a threshold that predictably again paid well below its 5.1% target.  *See supra* 23 (showing outlier payments in FY 2005 totaled only 3.96% of DRG payments or only 77% of the 5.1% target).

69

4.     <u>HHS's FY 2006 rulemaking was the third consecutive year that HHS unreasonably failed to account for steady declines in the CCRs or for reconciliation</u>

HHS's FY 2006 rulemaking finally used a charge inflation factor free of turbo-charging.  However, despite estimating that it had underpaid in FY 2004 and would again be underpaying in FY 2005, HHS refused to make other necessary corrections.

HHS again refused to adjust the projection CCRs to account for their acknowledged downward trend, as would be reflected in the lower payment CCRs, or to account for reconciliation.  Commenters repeated that HHS's continued failure to address these two important aspects of the problem would lead to continued inaccuracies, to an over-inflated threshold and, thus, to a third straight year of underpayments.  JA__-AR 658 (calling for CCR adjustment factor); JA__-AR 378-79 (recommending the use of a cost inflation factor); JA__-AR 394 (noting that the agency did not account for reconciliation).[22]  *District Hospital Partners* was not asked to consider these two issues, so they should be reviewed *de novo*.

_____

[22] Some commenters on the proposed rule suggested alternative lower thresholds that ended up being higher than HHS's final threshold.  *See Dist. Hosp. Partners*, 786 F.3d at 52-53.  However, they expressly noted that their proposals were based on the data available with the proposed threshold and would be lower still if recalculated using the updated data available with the final rule.

70

In response to the comments (now for the third time in three years) that HHS

needed to account for projection CCRs' expected decline, HHS presented a new

rationale:

> In many cases, for part of FY 2006, fiscal intermediaries will
> determine actual outlier payment amounts using the same [CCRs] that
> are in the March 2005 Provider-Specific File…. We note that the
> [CCRs] that we are using from the March 2005 Provider-Specific File
> are approximately 3 percent lower on average than the [CCRs] from
> the December 2004 Provider-Specific File that we used in setting the
> proposed [threshold].

JA__-AR 659.  HHS's statement is misleading and actually reinforces the

necessity of adjusting the projection CCRs.

As HHS knows, based on the timing of cost-report settlements, the vast

majority of the projection CCRs would be updated before the start of the FY, and

the remaining minority of projection CCRs that would actually be used would,

themselves, be updated by halfway through the FY.  It takes nine months "to

tentatively settle a cost report from the fiscal year end of a hospital's cost reporting

period."  JA__-AR 8232.  Thus, hospitals with calendar fiscal year-ends would

have CCRs updated in October.  Hospitals with federal fiscal year-ends would

have CCRs updated in June, *i.e.*, two additional times after the threshold was set

using the April update of the Provider-Specific File.

The truth about CCR updates was demonstrated below by reference to

HHS's own database setting forth hospital fiscal year ends and never contested by

HHS (thus conceded).  JA__-Dkt.No.127, at 35.  Thus, the district court was in error when it held this argument was "not tethered to anything in the record." Banner, JA__-Dkt.No.150, at 116.

Moreover, per HHS's own analysis, the average CCR dropped by 3% <u>in just the 3-months</u> from December 2004 to March 2005.  JA__-AR 659.  HHS's failure to adjust for this known trend in its model, without adequate justification, was again arbitrary and capricious.  *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994) ("[W]e must reverse the agency's application of [its] model as arbitrary and capricious if there is simply no rational relationship between the model and the known behavior of the [element] to which it is applied."); *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 709 (D.C. Cir. 2014) (setting aside rule where it "is not only unsupported by the evidence, but contradicted by it.").  HHS knew that use of a charge inflation factor was problematic because it failed to account for changes in projection CCRs.[23]  HHS arbitrarily and capriciously failed to provide a rational explanation (tied to the facts) as to why it was disregarding this important aspect of the problem.  *See supra* 57; *see Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 203-06.

---

[23] *District Hospital Partners* did not determine whether employing a charge inflation factor required an adjustment to account for the longstanding trend in declining CCRs.

Finally, HHS repeated its arbitrary and capricious response to comments regarding reconciliation:  it repeated its conclusory explanations without any record factual basis, while failing to disclose that hundreds of millions of dollars in referred outlier payments were pending reconciliation.  JA__AR 659.

Because HHS refused to change its methodology as commenters had urged (to account for declining CCRs and reconciliation), HHS again set a threshold that was likely to and did underpay – only 4.65% of its 5.1% target.  *See supra* 24.

> 5.  In FY 2007, HHS once again arbitrarily and capriciously used overstated CCRs and ignored reconciliation's impact, thus generating another predictably excessive threshold

In its FY 2007 rulemaking, HHS only marginally improved its methodology in setting the threshold.  HHS continued to disregard, or to address insufficiently, important aspects of the problem (*viz.*, the downward trend of CCRs and the effect of reconciliation).  Consequently, HHS set another threshold likely to pay below its 5.1% target.

First, in its final rulemaking notice (but not in the NPRM), HHS effectively conceded that that it had set excessive thresholds due to its failure to account for the downward trend in CCRs.  JA__-AR 8232-33.  HHS finally agreed that it needed to adjust the projection CCRs to bring them in line with the lower payment CCRs.  *Id.*  HHS could have adopted the simple and obvious alternative (using the most recent historical data) of basing its adjustment factor on the <u>actual</u> relevant

73

record trend.  That trend was at HHS's fingertips in the rulemaking, as HHS had calculated that "the case weighted national average []CCR" had declined by 2% in the most recent one-year period.[24]  Alternatively, commenters had suggested two other reasonable, simple ways to compute this trend – using either of two single measures of historical cost inflation along with the charge inflation factor to adjust the CCRs.  JA_-AR 7737-41, JA__-AR 7452-53, JA__-AR 7809-10.

However, and contrary to its claimed preference for using actual historical data to estimate charge growth, HHS instead concocted a complex formula in an attempt to _model_ the most-recent one-year decline in CCRs nationally.  JA__-AR 8232-33.  HHS's model produced a CCR adjustment factor of -0.27%.  Thus, HHS projected that the average CCR would decline by only about a quarter of one percent in the _entire_ 12 months following March 2006 (the date of the file from which HHS sourced projection CCRs).

This modeled CCR adjustment factor was _un_reasonable.  It directly contradicted the contemporaneous record data before HHS, including the most recent statistic (cited by HHS in the same rulemaking) of a one-year actual decline

---

[24] _See_ JA__-AR 8146 ("the case-weighted national average [CCR] declined by approximately 1 percent from the March 2005 to the December 2005 update of the Provider-Specific File."); JA__-AR 8233 ("the case-weighted national average CCR declined by approximately an additional 1 percent from the December 2005 to the March 2006 update of the Provider-Specific File.").

in CCRs of 2%.  Thus the <u>actual</u> downward trend was seven times greater than

HHS's <u>modeled</u> trend.

HHS also knew the latest actual trend because it had calculated the national

average CCR in the rulemaking to determine the level above which CCRs would

default to a lower statewide average whenever deemed aberrantly high.[25]

HHS's token adjustment factor was also unreasonable compared to HHS's

own documented historical annual rate of change in CCRs for the FYs 2001-2005

time period from which HHS developed its modeled adjustment factor.  For those

FYs, the <u>average</u> annual drop in the national average CCR was 4.8%, a factor more

than 17 times greater than that modeled by HHS.  JA__-Dkt.Nos.45-16,45-17, 45-

18,39-1,48-2,41-1.

HHS failed to explain why it ignored the most recent actual data (used for

other purposes within the same rulemaking) and chose instead to rely on modeled

data that produced an adjustment factor so starkly contrary to the actual historical

trends.  *See, e.g., Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1053 (D.C. Cir.

2001) ("While courts routinely defer to agency modeling of complex phenomena,

model assumptions must have a 'rational relationship' to the real world." (citation

omitted); *Sorenson Commc'ns*, 755 F.3d at 709 (setting aside rule where it "is not

---

[25] HHS did not publish the national average CCR values but expressly referenced
calculating same in each rulemaking.  *See* JA__-AR 8234 (FY 2007: explaining
HHS's calculation of the "mean of the log distribution of CCRs for all hospitals.").

only unsupported by the evidence, but contradicted by it."); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1153 (D.C. Cir. 2013) (noting that an agency "may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role").

The district court improperly rejected this challenge, finding that there were no "significant and viable and obvious alternatives … before the agency …." Banner, JA__-Dkt.No.150, at 118. But, as shown, HHS had the reasonably obvious alternative of using the <u>actual</u> record trend showing the 1-year drop in the national average CCR. That was the same approach that HHS used annually to determine its charge inflation factor and the same approach used to compute an adjustment factor in the IFR. JA__AR 4417.375. Further, by unveiling its modeled adjustment factor only in the final rule, HHS precluded commenting on its model. Indeed, in the FY 2008 rulemaking, the first year it was possible to do so, hospitals criticized HHS's model and suggested using the actual historical drop in the national average CCR. 72 Fed. Reg. at 47,417-18. Lastly, regardless of comment, HHS "retain[ed] a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule." *NRDC*, 755 F.3d at 1023.

Accordingly, HHS's CCR adjustment factor was arbitrary and capricious both because HHS ignored the "significant and obvious alternative" of using the

76

historical trend data (data routinely calculated and used for other purposes in the same rulemaking), and because its model produced an adjustment factor that was contrary to the known facts about the regulated landscape. *Dist. Hosp. Partners*, 786 F.3d at 58-60 (HHS violated the APA because HHS ignored, without explanation, the alternative of addressing certain data that distorted its projections of outlier payments in setting the threshold); *Nat'l Black Media Coal.*, 775 F.2d at 357 (finding agency's decision-making flawed where agency failed to consider an obvious alternative it had used in the past).

Finally, HHS continued its arbitrary and capricious pattern of refusing to account for the impact of reconciliation, of offering conclusory explanations without any factual basis, and of failing to disclose that it was sitting on $664 million in unreconciled outlier payments.

## C.     **Even Before Discovering Turbo-Charging, HHS Should Have Known Its Regulations Relied On A Faulty Factual Predicate And, Thus, Violated The APA**

In FYs 1997-2003, HHS's thresholds repeatedly generated total outlier payments billions of dollars over its annual 5.1% target and the 5-6% statutory range.  Furthermore, HHS's own data repeatedly disproved the central factual premise underlying HHS's outlier regulations: that hospitals would not manipulate charges and that, instead, charges would rise proportionally with costs.  Despite mounting evidence that these premises were incorrect, and despite ever-worsening

results, each year HHS stubbornly reapplied the same approach, without examining the root causes of its failures. As a result, each year, HHS's increasingly hyper-inflated thresholds (up 246% by 2003) grew less likely to pay out at the targeted amount or within the statutory range. This irreparably damaged the entire system by massively overpaying a small group of turbo-chargers and massively underpaying everyone else.

As to FYs 1998-2003, this appeal asks the Court to determine whether the APA permits HHS to implement its statutory mandate, in the face of increasingly adverse results, by "engag[ing] in Einstein's definition of folly – doing the same thing over and over again and expecting a different result." *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 193 (D.D.C. 2014).

Appellants believe the answer is "no." "The reasonableness of adopting a predictive methodology is not the same as the reasonableness of *maintaining* one in the face of experience; considering whether to maintain a methodology necessarily invites reflection on the success of earlier applications." *See Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 477 (D.C. Cir. 2013). Here, despite growing experience demonstrating that its modeling assumptions lacked "a 'rational relationship' to the real world," HHS arbitrarily and capriciously reapplied its model, hoping for different results. *Appalachian Power Co.*, 249 F.3d at 1053 (remanding in part for failure to explain "disparity between the EPA's

growth projections and observed growth rate"); *see also Gas Appliance Mfrs.*

*Ass'n v. DOE*, 998 F.2d 1041, 1045-6 (D.C. Cir. 1993) ("[T]he agency must

sufficiently explain the assumptions and methodology ... provide a complete

analytical defense of its model and respond to each objection with a reasoned

presentation.").[26]

    1.   <u>HHS knew that its 1988 payment regulation permitted charge
manipulation, but nevertheless assumed that hospital charges would
increase proportionally to costs</u>

Below, the Hospitals challenged the validity of HHS's 1988 payment

regulation as promulgated.  Here, however, the Hospitals focus more narrowly on

HHS's particularly egregious continued reliance on the 1988 regulation from FYs

2001- 2003, despite accumulated warnings that the regulation produced data with

little predictive value and despite abundant evidence that "the outlier payment

system [had] begun to break down in the late 1990s."  *Dist. Hosp. Partners*, 786

F.3d at 51; *see also Cnty. of L.A.*, 192 F.3d at 1009 ("Whether the Secretary's

projections prove to be correct will depend, in large part, on the predictive value of

the historical data on which she bases her calculations").

From the beginning, HHS knew that CCRs derived from 2-5-year-old cost

reports and from defaults to statewide-average CCRs might be unreliable for

---

[26] The district court did not address any of this authority.  *See* Banner, JA__-
Dkt.No.150, at 93; *see also* JA__-Dkt.No.127, at 49-53.

"adjust[ing]" charges "to cost." 42 U.S.C. §1395ww(d)(5)(A)(ii). In 1988, comments warned and HHS acknowledged that using such stale cost report data created the "incentive for hospitals to increase their charges and to manipulate their charge structures." JA__-AR 7389; *see also supra* 7-8. Dismissing this concern, HHS claimed that mitigating factors would control charge increases. JA__-AR 7389-90.[27]

Later, HHS was warned that defaulting suspiciously low CCRs to much higher statewide averages also "created a clear incentive for hospitals to artificially inflate their gross charges and circumvent the intent that hospitals only be paid marginal costs for outliers." JA__-AR 6685. HHS irrationally responded "the incentives a hospital would have to maximize outlier payments, if any, would be to lower charges in order to increase its [CCR]." *Id.* If fact, any charge reductions would not be timely reflected in a hospital's stale CCR and thus would yield lower imputed costs. Longer term, repeated charge reductions would trigger a default to a much <u>lower</u> statewide average, thereby further <u>lowering</u> the hospital's payments. Instead of recognizing "unreasonabl[y]" low CCRs as red flags warranting further investigation, *see* JA__-AR7345, HHS effectively erased them, akin to removing the battery from a blaring smoke detector.

---

[27] The Hospitals demonstrated below that HHS's mitigating factors were illusory and its reliance on them was arbitrary and capricious. JA__-Dkt.No.127, at 42-43. The district court failed to critically analyze this challenge.

80

Thus, HHS assumed the factual premise that hospital charges would move proportionally to costs and that hospitals would not spike their charges to take advantage of HHS's use of stale and defaulted CCRs.  However, as evidence mounted that these factual premises were incorrect, HHS did not reexamine its assumptions.  *See NRDC*, 755 F.3d at 1023 (noting an agency's obligation to "examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule").  Instead, HHS persisted in running the outlier program farther off the tracks.

>    2.    <u>Despite mounting evidence of its model's failure, HHS kept blindly trying to out-inflate what was turbo-charging without ever examining the root causes of the problem</u>

The district court mistakenly held that HHS was entitled, through 2003, to adhere blindly to its payment regulation when setting its annual thresholds, because HHS did not previously "reopen" its 1988 rulemaking.  *See* Banner, JA__-Dkt.No.150, at 60-61, 89-90 (citing *Biggerstaff v. FCC*, 511 F.3d 178, 186 (D.C. Cir. 2007)).  But this Court has rejected the argument that an agency "is under no duty to explain its continued adherence to settled policy," and affirmed that, "[i]n the rulemaking context … an agency may be forced to reexamine its approach 'if a significant factual predicate of a prior decision … has been removed.'"  *See Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (citation omitted).  This holding is a corollary to the principles (previously discussed) that agency action is

81

arbitrary and capricious where the agency knows its model fails to track the real

world but nevertheless reapplies the same failed model expecting different results.

*See supra* 78-79.

<blockquote>
a.    <u>Long before FY 2001, HHS knew it could no longer assume that charges increased proportionally to costs</u>
</blockquote>

Though perhaps even sooner, by FY 2001, HHS's continued adherence to

the payment regulation was well over the line separating reasonable action from an

APA violation. By the time HHS was setting the FY 2001 threshold, HHS itself

had repeatedly noted that "charges are rising much faster than costs." JA__-AR

4809; *see also supra* 49 n.12 (same, citing 9 instances), thereby undermining the

central factual predicate underlying the payment regulations.

Moreover, HHS's FYs 2001-2003 Impact Files, which contain HHS's <u>own</u>

calculated assumptions used to set the threshold, contradicted HHS's factual

predicate. Therein, HHS actually projected turbo-charging by a small number of

hospitals – for some, projecting over 200% in outlier payments relative to their

DRG payments. *See* JA__-Dkt.No.131, at 8-9; Banner, JA__-Dkt.No.150, at 95

(acknowledging this data "could reveal" turbo-charging).

The district court dismissed the Impact File evidence, stating that the data's

source was unknown. Banner, JA__-Dkt.No.150, at 95. However, the Hospitals

cited to the Impact Files (from the administrative records) for each assertion and

HHS never disputed its own data's accuracy.  *See* JA__-Dkt.No.127-8; JA__-Dkt.No.131, at 9.

Further, the district court incorrectly held that HHS's "possess[ion]" of the red-flag data did not impose any "obligation" on HHS to address or explain it unless someone else asked.  Banner, JA__-Dkt.No.150, at 95.  But an agency "retains a duty to examine key assumptions" regardless of whether a party has "raised a particular argument."  *See NRDC*, 755 F.3d at 1023.  The clearly excessive outlier payments, to a small group of hospitals projected in the Impact Files, comprise a clear red flag that the key assumptions underlying HHS's outlier regulations were wrong.

> b.    Contemporaneous data during each of the FYs 2001-2003 rulemakings demonstrated that HHS's model failed to set thresholds likely to pay at HHS's 5.1% target

The district court misconstrued the Hospitals' arguments, for any given FY's threshold, as Monday-morning quarterbacking based on performance data not yet available to HHS.  Banner, JA__-Dkt.No.150, at 60, 79, 93.  However, the Hospitals' challenge for each year was supported by specific evidence, known to HHS during the rulemaking, which demonstrated that its model was unlikely to set the threshold to pay 5.1%.  This included HHS's own data projecting turbo-charging and showing that charges were increasing much faster than costs.

In addition, data showed the repeated past failures of HHS's model to project hospital costs and appropriate thresholds. When finalizing its FY 2001 threshold, HHS knew that, from FYs 1997-2000, it had raised the threshold by 45% (JA__-AR 4398), while estimating negative aggregate cost inflation (-3.7%). *See* JA_-AR5518.11, 5254. And HHS knew its steep prior threshold increases had failed to yield outlier payments at its 5.1% target, estimating it had paid out 7.6% in FY 1999 and 6.2% in FY 2000. JA__-AR 5254-55. Nevertheless, HHS declined to grapple with the underlying cause of the model's past failures. Instead, HHS assumed its model worked and increased the FY 2001 threshold by another 25%. JA__-AR 4398.

In setting each of the FYs 2002 and 2003 thresholds, HHS had increasingly stark evidence that its model was broken and that HHS's assumptions did not track the regulated landscape. HHS knew that, since FY 1997, it had roughly <u>doubled</u> the threshold (raising it by 81% FYs 1997- 2001and by 117% FYs 1997-2002), despite estimating that cost inflation had been negative (-2.0%) through FY 2001 and barely positive (0.8%) through FY 2002. *See* JA__-AR 4398, 5518.11, 5410, 4948. HHS also knew that its huge spikes in the threshold had not worked; during each rulemaking, HHS estimated that, in each of the two prior years, it had

84

overshot its target by about 20%-50%.[28]  Yet for FYs 2002 and 2003 HHS again failed to grapple with the underlying causes and again simply continued its sharp increases to the threshold, by 20% and then 59%, respectively.  JA__-AR 4398.

From FYs 1997-2003, HHS raised the threshold by 246% (more than 25 times the increase in the agency's aggregate estimates of inflation), but had nevertheless overpaid its 5.1% target by about $9.4 billion.  *See* tables *supra* 10 & 11.  That HHS may not have been statutorily required to hit its payment target, *see* Banner, JA__-Dkt.No.150, at 94, misses the point.  HHS's failures to learn from and grapple with its repeated misses – not the misses themselves – are what breached HHS's "obligation to deal with newly acquired evidence in some reasonable fashion."  *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011).  By ignoring its past results, HHS doomed itself to setting future thresholds unlikely to "produce aggregate outlier payments" within the statutory range.  *Cnty. of L.A.*, 192 F.3d at 1013.

Addressing the Hospitals' argument that HHS should have known inflated charges were driving the above-described data, *see* JA__-Dkt.No.127, at 47-53, the district court made only a cursory reference to the "complex statutory and

---

[28] In FY 2002, HHS estimated FYs 2000 and 2001 total payments of 7.6% and 6.2%, respectively.  JA__-AR 4949.  In FY 2003, HHS revised upward its estimate of FY 2001 total payments to 7.7% and estimated FY 2002 at 6.9%.  JA__-AR 4810.

regulatory scheme" and an alleged lack of comments.  *See* Banner, JA__-Dkt.No.150, at 94-95.  But the Hospitals did cite to relevant comments raised during the rulemakings.  *See* JA__-Dkt.No.131, at 66 (citing JA__-AR 4978 for comment from FY 2001 rulemaking noting the "marked increases" in thresholds; JA__-AR 4898-99 for FY 2002 asking HHS to "verify the amount of cost outliers paid in a year" and noting the "substantial increase" in proposed threshold is "burdensome to a hospital's position;" JA__-AR 4809 and JA__-AR 4507 from FY 2003 noting the "declining trend in cost-to-charge ratios" and the need to "investigate" the effects of previous years' erroneous overpayments; JA__-AR 4438 from FY 2003 noting the "inconsisten[cy]" of HHS's projections "with historical experience, with no underlying assumptions set forth to justify this inconsistency.").

HHS's ostrich-like approach was on full display during the FY 2003 threshold rulemaking – notwithstanding five consecutive years of failure to set a threshold paying out anywhere near 5.1%.  HHS acknowledged that its analysis indicated "that charges [were] rising much faster than costs."  JA__-AR 4809.  Yet, HHS did not take the next logical step to question the cause of such high charges or to acknowledge that its observation contradicted the factual predicate on which it had based its 1988 payment regulations (and each threshold regulation since FY 1997).  Further, at a commenter's behest, HHS specifically examined

86

whether delayed CCR updates (caused by an <u>additional</u> delay in processing cost reports) were triggering "higher than expected outlier payments."  HHS asserted it did "not have any evidence" of such cause and effect.  *See* JA__-AR 4809-10.  The district court viewed this statement as irrelevantly implicating only "specific delays."  *See* Banner, JA__-Dkt.No.150, at 95-96. However, for HHS to say that it had no evidence of a relationship between high CCRs and unusually high payments ran counter to its own projections of turbo-charging in the Impact Files. *See Cnty. of L.A.*, 192 F.3d at 1021 ("[F]or the Secretary to say that she had 'no evidence…' runs counter to the evidence before the agency and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.") (internal citation omitted).

Had HHS only acknowledged its model's repeated failures and inaccurate factual premises, and examined its contemporaneous data, it would have seen that "a relatively small number of hospitals that have been aggressively gaming the current rules benefit by getting a hugely disproportionate share of outlier payments …." Scully Testimony at 7.  Instead, HHS repeatedly chose to engage in Einstein's definition of folly by irrationally trying to out-inflate charges with its threshold, a tactic that had repeatedly failed.

This critical failure resulted in the vast majority of hospitals being "forced to absorb the costs of the complex cases they treat …." *Id.*; *see also* JA__-AR 4398-

87

99.  HHS's choices were increasingly arbitrary and capricious in each of FYs 2001-2003 – a methodology that repeatedly fails, by ever increasing margins, to produce the intended result is increasingly arbitrary the longer it is applied.  *See e.g., Am. Petroleum Inst.*, 706 F.3d at 477; *Guindon*, 31 F. Supp. 3d at 193.

## D.    From FYs 1997-2003, HHS Violated Its Own Regulation And Used Statewide Average CCRs That Were Both Outdated And Inaccurately Calculated

While turbo-chargers exploited HHS' policy of defaulting to statewide average CCRs, HHS compounded the problem by failing to implement its own policy's requirements.  Each year, HHS's threshold regulation published lists of statewide average CCRs for the upcoming FY, in "Tables 8A and 8B" of the rulemakings.  *See* 42 C.F.R. § 412.84(g); *see also, e.g.*, JA__-AR 5364 (FY 2000); JA__-AR 5254 (FY 2001); JA__-AR 4949 (FY 2002); JA__-AR 4810 (FY 2003).  However, each FY at issue, HHS failed to use these new statewide average CCRs to calculate the threshold and failed even to calculate the statewide average CCRs values correctly.[29]

Contra its own regulation, HHS used statewide average CCRs from previous FYs to calculate its thresholds.  For example, in FY 2003, HHS used the incorrect (higher) FY 2002 statewide average CCR of 0.394 for a New Jersey hospital, when

---

[29] Because HHS did not disclose which providers defaulted, commenters were unaware HHS was violating its own regulations.

the FY 2003 statewide average CCR was 0.356, thereby overestimating the

hospital's outlier payments by an additional 11%.  Compare JA__-AR 4968.001;

JA__-AR 4417.332; JA__-Dkt.No.45-18; with  JA__-AR 4819.001.  Because

CCRs were decreasing nationally, this mistake exacerbated the impact of turbo-

charging and led to even greater hyper-inflated cost projections and thresholds.

HHS conceded "the impact files contain prior-year statewide average

figures."  JA__-Dkt.No.132, at 62-63.  But HHS's brief claimed that the CCRs in

the Impact Files were later updated with the correct CCRs for HHS's projections.

HHS provided no contemporaneous proof of this brand new explanation, clinging

instead to a generic statement in the Federal Register that HHS applied the

upcoming FYs "rates and policies."  *See, e.g.*, JA__AR 4807.  Even though this

*post hoc* explanation contradicts HHS's repeated representation to the public and to

the district court that the Impact Files contained the <u>actual</u> data it used to set

thresholds, [30] the district court accepted it.  Banner, JA__Dkt.No.150, at 90-91.

---

[30] JA__-Dkt.No.93-1, at ¶17 ("In creating the impact files … CMS determined
hospitals' [CCRs] . . . [by] substituting a statewide average [CCR] . . . . [from]
Tables . . . contained in the Federal Register notice . . . ."); *id.* at ¶24 ("Impact files
are used for . . . making outlier payment projections. . ."); s*ee also*, *e.g.*, 64 Fed.
Reg. 24,716, 24,747 (May 7, 1999) (stating the Impact File contains the data used
to estimate outlier payments); JA__-Dkt.No.45-17 (Impact File "layout" stating
"This file contains data used to estimate FY 2002 payments."); JA__-Dkt.No. 45-
14 (administrative record certification stating Impact File contains "the
assumptions used in determining the . . . outlier payment reimbursement rates.").

89

This was error because counsel's *post hoc* statements may not contradict the record.  *See, e.g., Electricity Consumers Res. Council v. FERC*, 747 F.2d at 1518.

HHS also miscalculated the updated statewide average CCRs themselves in Tables 8A and 8B.  Rather than computing the averages using defaulted hospitals' actual, miniscule CCRs, HHS used the substantially higher statewide average CCRs.  For example, to calculate the FY 2003 New Jersey statewide average, HHS incorrectly used the statewide average CCR of 0.394 for all eight defaulted New Jersey hospitals, not their actual CCRs, which ranged from 0.0103 to 0.192.  JA__-AR 4417.332; JA__-AR 4819.001; JA__-Dkt.No.45-18.   Although HHS denied this below, *see* JA__Dkt.No.132, at 63-64, the record itself clearly demonstrates these facts.  *See supra* 89 n.30.

HHS's arbitrary and capricious failures to follow its own regulations generated errors that exacerbated its overestimations of outlier payments and thresholds.  *See Nat'l Envtl. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (noting it is "axiomatic…that an agency is bound by its regulations").

**E.    The District Court Abused Its Discretion In Refusing To Consider Materials Cited And/Or Submitted In Appellants' Summary Judgment Motion**

In a Motion for Judicial Notice And/Or For Extra-Record Consideration of Documents And Other Related Relief ("Motion"), the Hospitals moved the district

90

court to consider a number of items referenced in their summary judgment brief as evidence and/or adjudicatory facts.  JA__-Dkt.No.128; *see generally* JA__-Dkt.No.127.  Further, the Hospitals moved to supplement the record for the FY 2004 rulemaking with a Federation of American Hospitals comment, which was included in the *District Hospital Partners* record.  The district court abused its discretion when it effectively refused to consider any of them.  *See* Banner, JA__-Dkt.No.150, at 44-50.

     1.    <u>Tables</u>

The district court abused its discretion when it refused to consider three tables containing solely <u>data</u> from the administrative record.  *See* Banner, JA__-Dkt.No.150, at 48-50; JA__-Dkt.No. 127-5 (depicting "National Average Operating CCR" dropping from 1997–2007) ("Exhibit 5"); JA__-Dkt.No. 127-7 (setting forth statewide CCRs and certain Impact File CCRs) ("Exhibit 7"); JA__-Dkt.No.127-8 (depicting the ratio of outlier payments to DRG payments of hospitals identified by HHS as being assigned the statewide average CCR) ("Exhibit 8").  The district court held that the tables "are not exempt from the page limit," and that "[a]ny material . . . that is not a faithful reproduction of the unadorned administrative record" was argument.  *See* Banner, JA__-Dkt.No.150, at 48-49.  The court found it "immaterial" that the Hospitals had space on the final

page of their brief to list all the administrative record citations that comprise the tables. *See id.* at 50 n.21.

These tables faithfully reproduced record data and should not count towards the page limits. *See Taylor v. Mills*, 892 F. Supp. 2d 124, 135 n.16 (D.D.C. 2012) ("The page limitation in Local Civil Rule 7(e) … does not encompass attached exhibits."). HHS identified no discrepancy between the tables and the Impact files, complaining only that the exhibits combine multiple years' administrative records. *See* JA__-Dkt.No.132, at 64. HHS argued that Exhibit 5 (containing Impact file data) should not have included statewide average CCRs but it contained only data from the administrative record.[31] *See id.* at 66. Given the undisputed accuracy of the tables, the district court abused its discretion in striking them, particularly when HHS demonstrated no prejudice from their inclusion. *Martin v. D.C.*, 78 F. Supp. 3d 279, 291-92 (D.D.C. 2015) (denying a motion to strike exhibits where the "only concrete assertion of prejudice" was unfounded).[32]

---

[31] HHS neither disputed the calculations' accuracy nor argued that the national averages would differ materially if the statewide CCRs were replaced. In contrast, as demonstrated, including the statewide average CCRs in HHS's calculations of statewide averages for individual states had a material impact. *See supra* 88-90.

[32] The authority cited by the district court, *see* Banner, JA__-Dkt.No.150, at 49, was inapposite. *See Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 114 (D.D.C. 2014) (rejecting an attempt to submit as "appendices" 52 pages of "supplementary briefing").

Further, striking the tables made it impossible for the court to review the relevant data because the Impact files themselves are enormous spreadsheets. Each contains roughly 120,000 cells and was filed by HHS without pagination or Bates numbers.  *See* JA__-Dkt.No.130, at 15; *see also* Fed. R. Evid. 1006 ("Summaries to Prove Content").  The tables contained only record data, not arguments, and should have been considered because the court's effective review of the data was not possible without them.

2.    Additional Items

The Hospitals also asked the district court to consider certain publicly available items, including: (1) the Scully Testimony and (2) two briefs submitted by the United States in another outlier-related case ("*Boca* Briefs").  *See* JA__-Dkt.No.128, at 2-6.  The district court held they did not meet the "standard for consideration of extra-record evidence," and could not "serve as the foundation for Plaintiffs' claims."  Banner, JA__-Dkt.No.150, at 46.  The district court abused its discretion in refusing to consider these additional items as extra-record evidence because they contained information necessary for effective judicial review of HHS's actions after it discovered turbo-charging.

Extra-record evidence may be considered when "the agency failed to examine all relevant factors" or "explain adequately its grounds for its decision," and "resort to extra-record information is necessary to enable judicial review to

93

become effective." *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156-57 (D.D.C. 2012), *rev'd on other grounds*, 758 F.3d 243 (D.C. Cir. 2014) (alterations and citations omitted).

The Scully Testimony qualifies as proper extra-record evidence. It explains something the record otherwise fails to explain: why HHS abandoned its conclusion in the IFR that both the statute and the public interest required HHS to lower the FY 2003 threshold immediately. *See supra* 17-18 (quoting Scully Testimony regarding OMB's opposition). The Scully Testimony also discloses that HHS "did not understand why" it "kept missing and missing" its targets and "really never understood the dynamics" of its model. *See* Scully Testimony at 4. This demonstrates that HHS failed to examine all relevant factors. Finally, it contains specific examples of payments made to turbo-chargers. *See supra* 17.

The *Boca* Briefs also demonstrate that HHS failed to consider certain relevant factors, and that it has adopted a convenient litigating position in the instant case. First, HHS has previously construed the outlier statute in the same way the Hospitals do here. *See* Boca Brief 1, at 5-8 ("The Outlier Statute Unambiguously Limits Outlier Payments To Extraordinarily Costly Cases") (emphasis added). The second *Boca* brief reveals the turbo-chargers' identities and the amounts of their invalid payments. *See* JA__-Dkt.No.127, at Ex. 3. The *Boca* briefs demonstrate important facts regarding the FY 2003 rulemaking that HHS did

94

not discuss in the record:  HHS continued to make outlier payments to the same

turbo-chargers, even though HHS had already concluded that the statute forbids

such payments, and also included those statutorily prohibited payments in setting

the threshold.

Thus, the district court abused its discretion in refusing to consider the *Boca*

briefs and the Scully testimony, both of which contain undisputed facts crucial to

effective judicial review of HHS's actions.

### 3.    Comment Letter

The district court abused its discretion in refusing to supplement the record

or consider a comment from the Federation of American Hospitals on the FY 2004

rulemaking.  The district court stated HHS would be unduly prejudiced because the

Hospitals had not sought its inclusion earlier.  Banner, JA__-Dkt.No.150, 47, 108.

That ruling was an abuse of discretion, because HHS had represented that it had

produced all comments.  But, despite including the comment in the FY 2004 record

in *District Hospital Partners*, HHS never corrected its omission in the instant case.

Moreover, HHS demonstrated no prejudice from its inclusion.  First, HHS was

aware of the comment, as the Federal Register references its analysis.  *See Dist.*

*Hosp. Partners*, 786 F.3d at 52-53; *compare* JA__-Dkt.No.127, at Ex. 6, at 6-7

("[T]he outlier threshold should be $25,375."), *with* JA__-AR 1157 ("The

commenter estimated the fixed-loss threshold to be $25,375….").  Also, HHS had

the full opportunity to address the comment in opposition to the Hospitals'

summary judgment motion.  Lastly, given that HHS lost many records from the FY

2004 rulemaking, including boxes of comments, and had no comment log, the only

parties prejudiced were the Hospitals.

**F.**    **The Hospitals' Claims Under APA Section 553 Are Not Futile**

The district court denied as futile the Hospitals' motion to amend to add a

procedural claim under APA § 553.  *See* JA__-Dkt.No.117, at 16.  This denial was

based on a misapplication of *American Radio Relay League v. FCC*, 524 F.3d 227

(D.C. Cir. 2008).

*American Radio* clarifies that an agency may not selectively disclose only

those portions of an analysis or study that support its rulemaking and exclude

portions that, inconveniently, support other undisclosed alternatives.  There, the

FCC relied on certain technical studies, but had redacted portions of the studies

that ran counter to its rulemaking.  524 F.3d at 237.  The D.C. Circuit rejected the

FCC's argument that it could hide the redacted portions because they "were not

relied upon," finding that a commenter may have had "something useful to say

regarding the unredacted studies, that [might have] allow[ed] it to mount a credible

challenge…."  *Id.* at 237-38 (internal quotation marks omitted).

Here, like in *American Radio*, HHS's 2003 NPRM disclosed only an

effectively redacted version of the complete study and analysis set forth in the IFR.

96

This cherry-picking violated section 553 because the public neither received notice of, nor had the opportunity to comment on, pertinent data contrary to HHS's position.  Comparing the 2003 NPRM to the IFR shows that HHS relied on most of the IFR, but omitted portions (data, analysis and conclusions) that required immediately lowering the FY 2003 threshold.  The lack of notice of these omitted portions, which were contrary to HHS's published position, hindered commenters' ability to evaluate and comment on HHS's proposed rule.  *See* JA__-AR 2208-09 ("The absence of any quantitative data in the proposed rulemaking regarding the effects of the proposed payment changes on hospital payments makes it very difficult for us . . . to provide the Secretary with meaningful comment … <u>These data are absolutely critical to assessing the impact of the proposed regulation on our hospitals and the patients we serve</u>.") (emphasis added).

The section 553 violation here is even more egregious than in *American Radio*.  Even though HHS's 2003 NPRM contained the required section on "Alternatives Considered but Rejected," HHS failed to mention the IFR's alternative of immediately lowering the threshold.  *Compare* JA__-AR 4417.395, *with* JA__-AR 4394.  "It is one thing for [an agency] to give notice and make available for comment the studies on which it relied in formulating the rule while explaining its non-reliance on certain parts.  It is quite another thing to provide notice and an opportunity for comment on only those parts of the studies that the

[agency] likes best." *Am. Radio*, 524 F.3d at 239-40. HHS's failure to disclose the alternatives in the IFR frustrated the purpose of section 553, which is to "ensure[] that an agency does not fail to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary. . .." *Id.* at 237 (internal quotations omitted).

Similarly, although HHS told the public "first quarter FY 2003 data" was not then available, it redacted the portion of its study in the IFR using first quarter FY 2003 data to find that "existing FY 2003 outlier payments" to the 123 turbo-chargers "constitute 21.7% of all outlier payments nationally." JA__-AR 4417.373. Accordingly, the Hospitals' section 553 claims were not futile.

Because the 2003 NPRM violated section 553 as a matter of law, the Court should skip the unnecessary step of remanding to permit amending the complaint. *See Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1085 (D.C. Cir. 1998) (determining that it "would be a waste of judicial resources" to "remand this case for the district court to consider" amended claim it had previously deemed futile). Instead, this Court should declare that the portion of the outlier correction rule reestablishing the FY 2003 threshold violated section 553 and vacate that portion of the rulemaking. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (holding deficient notice almost always requires vacatur).

98

# IX.  <u>CONCLUSION</u>

The Hospitals respectfully request that the Court (1) find that the district court abused its discretion in excluding items from the summary judgment briefing and the administrative record; (2) abused its discretion in denying the Hospitals' motion to amend; (3) declare HHS's FY 1998-2007 regulations as arbitrary, capricious, an abuse of discretion, contrary to the statutory mandate, and/or otherwise procedurally and/or substantively not in accordance with law; and (4) vacate these regulations, and remand to HHS to recalculate the FY 1998-2007 fixed loss thresholds and grant such other and further relief as may be in accordance with this Court's rulings.

010-8258-9442

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 21,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated: November 7, 2016          /s/ Stephen P. Nash
                                 Stephen P. Nash
                                 Sven C. Collins
                                 Attorneys for Appellants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 7th day of November, 2016, I served the

foregoing *Brief for the Appellants* electronically via the Court's CM/ECF System

upon the following counsel of record for Appellee:

Benjamin M. Shultz
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 514-3518
Fax: (202) 514-7964
Email: benjamin.shultz@usdoj.gov
*Counsel for Appellee*

Michael S. Raab
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 514-4053
Fax: (202) 514-7964
Email: michael.raab@usdoj.gov
*Counsel for Appellee*

*/s/ Stephen P. Nash*
Stephen P. Nash
Attorney for Appellant

101